STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HENRY MICHAEL ROTH, DEFENDANT-RESPONDENT.

Argued October 12, 1983—Decided February 7, 1984.

336

338

Anthony Martinez, Assistant Prosecutor, argued the cause for appellant (John J. Stamler, Union County Prosecutor, attorney).

James A. Vigliotti argued the cause for respondent (Heim and Barisonek, attorneys).

*Victoria Curtis Bramson,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for *amicus curiae* Public Defender (*Joseph H. Rodriguez,* Public Defender, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This is the first time we have addressed in detail the standards that guide sentencing and review courts under the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 98–4, and that govern the State's right to appeal sentences under *N.J.S.A.* 2C:44–1(f)(2). It is our view that the Code established an entirely new sentencing process. It displaced standards established under prior decisional law, created presumptive terms of imprisonment, and limited the discretionary power of sentencing courts. Our appellate supervision of the sentencing process in this case requires us to remand for sentencing in accordance with the standards we define today.

Defendant Roth pleaded guilty to a charge of aggravated sexual assault. The presence and threatened use of a weapon made the offense a crime of the first degree. *N.J.S.A.* 2C:14–2(a)(4). On June 28, 1982, a young mother strolling a child on a Cranford street was stopped by defendant. At knifepoint he forced her under a bridge overpass. She pleaded with him not to harm her or her baby. At fear of injury, she was forced to perform a sexual act upon him. He did not injure the child sleeping in the carriage.

Tests performed on Roth while he was in custody revealed a severe alcohol dependence and a drug abuse problem. His past criminal offenses were alcohol-related. The Avenel Adult Diagnostic and Treatment Center found no evidence of compulsive psychosexual behavior and reported that Roth did not come under the sex offender provisions of *N.J.S.A.* 2C:47–1 to –7.

The Trenton Psychiatric Hospital, the defense psychiatrist, and the Runnells Hospital Alcoholic Rehabilitation Unit were unanimous that Roth should receive extensive treatment for his substance abuse in a residential facility. The sentencing judge received over 30 letters from parish priests, employers, friends, relatives, neighbors, naval shipmates, and drug treatment professionals urging that Roth not be imprisoned, that his behavior was out of character, and that the incident was the result only of his drug and alcohol problems. Earlier on the day of the crime, Roth had been drinking heavily and had consumed half a quaalude.

The trial court sentenced Roth to five years' probation on condition that he undergo a specified in-patient rehabilitation program and that he continue his visits to Alcoholics Anonymous.

The State appealed on February 28, 1983, pursuant to *N.J.S.A.* 2C:44–1(f)(2).[1] We directly certified the case under *R.* 2:12–1. 94 *N.J.* 622 (1983).

## I.

### A.

It was once axiomatic that criminal sentences were beyond the scope of appellate review. In *State v. Benes,* 16 *N.J.* 389, 396 (1954), Justice Brennan said "[a] judgment of sentence is not ordinarily revisable by an appellate court where the sentence is within authorized statutory limits." *See also In re Lewis,* 11 *N.J.* 217 (1953).

*State v. Johnson,* 67 *N.J.Super.* 414 (App.Div.1961), surveyed the history of appellate review of sentences and found the only impediments to such review were "historical assumptions and

---

[1] Roth had been charged in a separate indictment with third degree arson stemming from a June 28, 1983, incident. The court's probationary sentence considered both offenses. The State has no right to appeal the arson sentence under *N.J.S.A.* 2C:44–1(f)(2), since it was an offense of the third degree.

meagre precedent." *Id.* at 427. Judge Gaulkin wrote that the courts had the "power to correct an illegal *or improper* sentence," *id.* at 428 (quoting *State v. Culver,* 23 *N.J.* 495, 505 (1957)) (emphasis in *Johnson* ), and concluded "we have the right to revise a sentence where it is manifestly excessive, even though within authorized statutory limits." *Johnson,* 67 *N.J.Super.* at 432.[2]

Since *Johnson,* "[t]he defendant's right to appeal from his sentence as manifestly excessive has become firmly established in our State." *State v. Kunz,* 55 *N.J.* 128, 141 (1969). While the right of appellate review in New Jersey has been established, this right had been exercised exclusively by defendants in appealing sentences that while within the statutory maximum, were found to be excessive. *See, e.g., State v. Leggeadrini,* 75 *N.J.* 150 (1977); *State v. Hicks,* 54 *N.J.* 390 (1969); *State v. Bess,* 53 *N.J.* 10 (1968).

A State appeal that seeks to increase a defendant's sentence presents other distinct problems. In *State v. Ryan,* 86 *N.J.* 1, 9 (1981), a pre-Code case, we held that double jeopardy principles

---

[2]Sentence revision was considered in *State v. Gray,* 37 *N.J.L.* 368 (Sup.Ct. 1875), where, citing both early English and American cases, the court decided that "where there was no legislative act conferring any authority to impose the proper sentence, or to remand the prisoner to the court of original jurisdiction for that purpose," the only possible judgment "was that of reversal, which operated to discharge the prisoner." *Id.* at 371 (quoting *Ex parte Lange,* 85 *U.S.* (18 *Wall.*) 163, 184, 21 *L.Ed.* 872, 881 (1874) (Clifford, J., dissenting)).

The doctrine that appellate courts had no jurisdiction to revise a sentence but only to declare one manifestly illegal, persisted and was followed in *Roop v. State,* 58 *N.J.L.* 487 (Sup.Ct.1895). During this period it was obviously useless to appeal the length of a sentence, hence no such appeals are noted.

It was not until 1898 that the Legislature provided that "[w]henever a final judgment in any criminal case shall be reversed * * * on account of any error in the sentence, the court in which such reversal was had may render such judgment therein as should have been rendered, or may remand the case for that purpose to the court before which the conviction was had." *L.*1898, *c.* 237, § 144.

barred the imposition of any increased sentence after violation of probation when the defendant already served a portion of that custodial sentence.

We have not yet passed on the constitutionality of the State's right to appeal under *N.J.S.A.* 2C:44–1(f)(2). It has been argued in this case that such an appeal is unconstitutional under the Double Jeopardy Clauses of the New Jersey Constitution, Art. I, para. 11, and the Federal Constitution, Amend. V, as made binding on the states, *Benton v. Maryland,* 395 *U.S.* 784, 89 *S.Ct.* 2056, 23 *L.Ed.*2d 707 (1969). We disagree.

Precedents are few because at common law the prosecution had no right to appeal in any criminal case, much less appeal the length of a sentence. *See generally* Note, 9 *Rutgers L. Rev.* 545 (1955). Thus, the government cannot take an appeal in a criminal case absent express statutory authority. *United States v. Sanges,* 144 *U.S.* 310, 12 *S.Ct.* 609, 36 *L.Ed.* 445 (1892); *State v. Watson,* 183 *N.J.Super.* 481 (App.Div.1982). For a long time, then, statutory restrictions on government appeals made discussion of the constitutional question unnecessary. With the 1971 revision of 84 *Stat.* 1890, 18 *U.S.C.A.* § 3731, Congress allowed government appeals up to the limits of the Constitution. This triggered Supreme Court decisions on whether such appeals violated the Double Jeopardy Clause of the Fifth Amendment.

In *United States v. Wilson,* 420 *U.S.* 332, 95 *S.Ct.* 1013, 43 *L.Ed.*2d 232 (1975), Justice Marshall reviewed the history of the Double Jeopardy Clause and concluded it "was directed at the threat of multiple prosecutions, not at Government appeals, at least where those appeals would not require a new trial." *Id.* at 342, 95 *S.Ct.* at 1021, 43 *L.Ed.*2d at 241. The government could therefore take an appeal when the trial court granted the defendant's postverdict motion and dismissed the indictment; even if the government succeeded on appeal, the jury's guilty verdict would be reinstated and there could not be a second prosecution. *See also United States v. Martin Linen Supply Co.,*

430 *U.S.* 564, 569–70, 97 *S.Ct.* 1349, 1353–54, 51 *L.Ed.*2d 642, 650 (1977).

The specific question of the right of government to appeal sentences was addressed by the Court in *United States v. DiFrancesco*, 449 *U.S.* 117, 101 *S.Ct.* 426, 66 *L.Ed.*2d 328 (1980). That case involved the government's right to appeal a sentence imposed under the "dangerous special offender" provisions of the Organized Crime Control Act. By a 5–4 vote, the Court held such appeals, when explicitly authorized by Congress, did not violate the Double Jeopardy Clause's proscription against multiple trials. *Id.* at 132, 101 *S.Ct.* at 434–35, 66 *L.Ed.*2d at 342. The court rejected the argument that imposition of sentence is an "implied acquittal" of any harsher sentence and, therefore, not appealable. *Id.* at 133, 101 *S.Ct.* at 435, 66 *L.Ed.*2d at 343. The defendant does not have any expectation of finality if the statute authorizes government appeal. More important, with the determination of guilt made, the defendant is not subject to the harassment and risk of multiple prosecution the Double Jeopardy Clause was meant to prohibit. *Id.* at 136, 101 *S.Ct.* at 437, 66 *L.Ed.*2d at 345. The dissenters focused on the Double Jeopardy Clause's protection against multiple punishment and argued that imposition of sentence should be accorded the same finality as an acquittal. *Id.* at 144, 101 *S.Ct.* at 441, 66 *L.Ed.*2d at 350 (Brennan, J., dissenting).

The right of the State to appeal sentences is a troubling question, as evidenced by the Supreme Court's five to four split in *DiFrancesco*. We have consistently followed the principles of the federal Double Jeopardy Clause because its language is broader than our State's. *State v. Barnes*, 84 *N.J.* 362, 370 (1980); *State v. Lynch*, 79 *N.J.* 327, 340 (1979); *State v. Rechtschaffer*, 70 *N.J.* 395, 404 (1976); *State v. Jones*, 188 *N.J.Super.* 201, 204–06 (App.Div.1983). Although we are free to construe our State constitutional provisions more expansively than the Supreme Court construes the corresponding federal provisions, particularly when there are peculiarly local considerations,

*State v. Hunt,* 91 *N.J.* 338, 345 (1982), we find no such considerations here to give a broader reading to our concededly narrower State Double Jeopardy Clause. *See State v. Farr,* 183 *N.J.Super.* 463 (App.Div.1982).

■ Nor do we find that the provisions for State sentence appeal lack sufficient standards to guide decisionmakers thus resulting in arbitrary and uneven sentence appeal by prosecutors: "Vague laws deprive citizens of adequate notice of proscribed conduct, *Lanzetta v. New Jersey,* 306 *U.S.* 451, 453, 59 *S.Ct.* 618, 619, 83 *L.Ed.* 888, 890 (1939), and fail to provide officials with guidelines sufficient to prevent arbitrary and erratic enforcement." *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 118 (1983). As we shall see in Part II hereof, the Code is anything but vague. The central theme of the Code's sentencing reforms is the replacement of the unfettered sentencing discretion of prior law with a structured discretion designed to foster less arbitrary and more equal sentences. Nor do we find that the provisions for State appeal affect principles of fundamental fairness that we apply in supervision of the administration of justice. *Monks v. New Jersey State Parole Bd.,* 58 *N.J.* 238 (1971); *State v. De Bonis,* 58 *N.J.* 182 (1971). The provisions for State appeal are procedurally fair; their substantive fairness is a matter of legislative policy that does not offend constitutional principle. *See New Jersey State Parole Bd. v. Byrne,* 93 *N.J.* 192 (1983) (statement of reasons must be furnished in parole eligibility decisions to afford procedural due process).

B.

New Jersey's pre-Code policy of sentencing reflected prevailing American common law:

The philosophical justification for "punishment" has divided men for centuries. Suggested bases or aims are (1) retribution, (2) deterrence of others, (3) rehabilitation of the defendant, and (4) protection of the public by isolation of the offender. Redmount, *"Some Basic Considerations Regarding Penal Policy,"* 49 *Journal of Criminal Law, Criminology and Police Science* 426 (1959). Today retribution is not a favored thesis, although some still claim a need to satisfy a public demand for vengeance. Perhaps it persists as an unarticulated premise in

individual sentences. Present day thinking emphasizes deterrence and rehabilitation. * * *

Expressed in other terms, the prevailing theme is that punishment should fit the offender as well as the offense. * * * Except where the Legislature has decreed a mandatory sentence, thereby determining the punishment should fit the offense without regard to the circumstances of the offender, the problem devolves upon the sentencing judge. Our Legislature has not stated the aims to be achieved by punishment. Indeed few Legislatures have, and where they have, the statement has been "too general to be of service." * * *

No single aim or thesis can claim scientific verity or universal support. Agreement can hardly be expected until much more is known about human behavior. Until then, the sentencing judge must deal with the complex of purposes, determining in each situation how the public interest will best be served. * * * There can be no precise formula. The matter is embedded deeply in individual discretion. [State v. Ivan, 33 N.J. 197, 199–201 (1960) (citations omitted).]

In that view "the judge must decide in what way the interest of the public will best be served." Ivan, 33 N.J. at 201. It was up to the individual judge to establish a priority among the philosophical justifications for punishment.

This sentencing theory reflected a broader philosophical viewpoint that "[r]etribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337, 1343 (1949) (footnote omitted). As Professor Andrew von Hirsch observed:

This dominant sentencing ideology stressed two themes: rehabilitation and prediction of future criminality. The judge was supposed to fashion the sentence to promote the offender's resocialization. The sentence also was supposed to reflect the likelihood of the offender's offending again: if his prognosis was favorable, he should be given a sentence in the community; if unfavorable, he should be separated from the community as long as he remained a risk. [von Hirsch, "Recent Trends in American Criminal Sentencing Theory," 42 Md. L. Rev. 6, 8 (1983) (footnote omitted).]

This philosophy was widespread and the result was that

[s]entencing and parole release decisions in this country have largely been left to the unfettered discretion of the officials involved. Legislatures have traditionally set high maximum penalties within which judges must choose specific sentences, but generally have provided little guidance for the exercise of this choice. Although the purposes of sentencing have often been defined as including deterrence, retribution, incapacitation, rehabilitation, and community

condemnation to maintain respect for law, legislatures have been silent regarding which purposes are primary and how conflicts among the purposes are to be resolved. [*Bullington v. Missouri,* 451 *U.S.* 430, 443 n. 16, 101 *S.Ct.* 1852, 1860 n. 16, 68 *L.Ed.2d* 270, 282 n. 16 (1981) (quoting Hoffman and Stover, "Reform in the Determination of Prison Terms: Equity, Determinacy, and the Parole Release Function," 7 *Hofstra L. Rev.* 89, 96 (1978)).]

This philosophy was explicitly set forth in the Model Penal Code, approved by the American Law Institute in 1962, and in the 1968 American Bar Association's Standards Relating to Sentencing Alternatives and Procedures. Both encouraged suspended sentences as an alternative to imprisonment. Both emphasized that the court should not impose a sentence of imprisonment unless it was necessary to protect the public, the offender needed treatment most effectively afforded by commitment, or because a lesser sentence would minimize the seriousness of the crime. Model Penal Code § 7.01(1) (1962).

Such ideas were dramatically challenged in the 1970s: "To note a revolution in thought regarding the sentencing of criminal offenders is perhaps to begin with understatement." Perlman and Stebbins, "Implementing an Equitable Sentencing System: The Uniform Law Commissioners' Model Sentencing and Corrections Act," 65 *Va. L. Rev.* 1175, 1176 (1979). This transformation in thought was spurred by powerful critiques. *See* Struggle for Justice (American Friends Service Committee 1971); M. Frankel, Criminal Sentences: Law Without Order (1973); J. Mitford, Kind and Usual Punishment (1973); A. von Hirsch, Doing Justice: The Choice of Punishments (1976); Fair and Certain Punishment, Report of The Twentieth Century Fund Task Force on Criminal Sentencing (1976) [hereinafter cited as Fair and Certain Punishment].

This last study concluded:

After two decades or more of intense concern over the inadequacies of the criminal justice system, the nation still appears unable to check the rise in crime, especially violent crime. All that appears to be certain is that more of everything—more police, more courts, more prisons, more laws—will not achieve the intended objective of reform in the system of criminal justice that can ultimately lead to a lower crime rate. * * * The greatest indictment of the criminal justice

system in the United States is simply that it fails in providing equitable justice.
* * *

> Although the Task Force does not overlook the other serious problems that afflict the criminal justice system in the United States, we believe that perhaps the major flaw is the capricious and arbitrary nature of criminal sentencing. By failing to administer either equitable or sure punishment, the sentencing system—if anything permitting such wide latitude for the individual discretion of various authorities can be so signified—undermines the entire criminal justice structure. [Fair and Certain Punishment, *supra,* at 3.]

Other studies were equally disconcerting: The country's sentencing provisions are "so arbitrary, discriminatory, and unprincipled that it is *impossible* to build a rational and humane prison system on them." N. Morris, The Future of Imprisonment 45 (1974) (emphasis in original). Judge Marvin Frankel described sentencing as a "vast wasteland in the law." Frankel, "Lawlessness in Sentencing," 41 *U. Cin. L. Rev.* 1, 54 (1972). Senator Kennedy wrote:

> Sentencing in America today is a national scandal. Every day our system of sentencing breeds massive injustice. Judges are free to roam at will, dispensing ad hoc justice in ways that defy both reason and fairness. Different judges mete out widely differing sentences to similar offenders convicted of similar crimes. There are no guidelines to aid them in the exercise of their discretion, nor is there any mechanism for appellate review of sentences. [Kennedy, "Introduction," 7 *Hofstra L. Rev.* 1, 1 (1978) (footnote omitted).]

Each commentator cited what were referred to as "favorite atrocity stories." Frankel, Criminal Sentences, *supra,* at 17. Each focused upon disparity in sentencing as the cruelest manifestation of a sentencing system bereft of structure. Central to the demise of the old structure was the clinical evidence that the prevailing theory of rehabilitation simply did not work. These studies led irrevocably to the conclusion that the criminal justice system had no idea how to rehabilitate offenders and reduce recidivism. *See* Martinson, "What Works?—Questions and Answers About Prison Reform," 35 *Pub. Interest* 22 (1974).

The American Friends Service Committee Report offered an influential alternative concept of just sentencing. Its proposal for a radical about-face in sentencing, which advocated "a return to the principle of uniform application of penal sanctions" rather than "varying criminal sanctions according to

individual characteristics," set the trend for the 1970s. Struggle for Justice, *supra,* at 151. The consensus soon emerged among proponents of sentence law reform that the theory of rehabilitation should be abandoned as a primary justification for the nature and length of sentences. This change was so sweeping that one commentator wrote: "That I and many other academics adhered in large part to this reformative viewpoint only a decade or so ago seems almost incredible to most of us today." Alschuler, "Sentencing Reform and Prosecutorial Power: A Critique of Recent Proposals for 'Fixed' and 'Presumptive' Sentencing," 126 *U. Pa. L. Rev.* 550, 552 (1978). A second and related change was an increasing recognition that some rule of law must replace unstructured discretion in our penal system. The basic concept was for "offense-oriented, non-individualized determinate sentencing." *See* von Hirsch, "Recent Trends in American Criminal Sentencing Theory," 42 *Md. L. Rev.* 6 (1983); Weigend, "Sentencing in West Germany," *id.* at 37 (comparative criminal justice symposium).

New models for sentencing arose. *See, e.g., Cal.Penal Code* § 1170 (West 1983) (punishment has to be "proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances"); *Ill.Ann.Stat.* ch. 38, ¶¶ 1005–1–1 to 1005–10–2 (Smith-Hurd 1982); *Wash.Rev.Code Ann.* ch. 9.94A (West Supp.1983–84) (to become effective July 1, 1984). Minnesota established a special rule-making commission to set sentencing standards and provided for appellate review of sentencing. *Minn.Stat.Ann.* §§ 244.09 to 244.11 (West 1983); Minnesota Sentencing Guidelines and Commentary (1983), *reprinted in* 339 *N.W.*2d LIII (1983) [Minnesota Cases].

On the federal side, Senate Bill No. 1437 (the Omnibus Crime Control Act) represented the most serious attempt made by Congress to achieve procedural regularity in the sentencing and parole process without discarding the idea of individualization. It included what has been described as the trinity of sentence reform: a procedural requirement for explaining decisions; a

sentencing commission as an agency to promulgate sentencing ranges within the statutory minima and maxima set by the Congress; and provision for appellate review of sentencing. S.1437, 95th Cong., 2d Sess. (1978).

The National Conference of Commissioners on Uniform State Laws proposed new standards. Its Model Sentencing and Corrections Act of 1978 reported:

—The current system is ineffective in that it neither rehabilitates offenders, isolates the offenders likely to commit future crimes, nor allows effective use of deterrence principles.

—The current system results in large scale disparity in sentences creating frustrations, tensions, and disrespect for the system in both the offenders and the public-at-large.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The provisions of Article 3 reflect the use of "just desert" as the overriding philosophy justifying the imposition of criminal sanctions. This philosophy requires that the nature and severity of the sanction imposed to be deserved on the basis of the offense committed and certain limited mitigating and aggravating factors relating to the offender. This seeks to avoid the injustice that results from utilizing the other traditional purposes of punishment.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The abandonment of rehabilitation as a factor in determining the nature or length of the sentence does not abandon rehabilitation as a goal of the correctional system. Within the sentence imposed based on just desert, the Act requires that offenders be provided with programs and services to better themselves. [Model Sentencing and Corrections Act, Art. 3, Prefatory Note (1978), 10 U.L.A. 175–76 (Supp.1983) (emphasis in original).]

The second American Bar Association report on sentencing issued in 1979 reflected a change in thinking on the part of that body. The new report moves cautiously away from purely discretionary sentencing: "Our prescription * * * is not to abolish discretion but to structure it." American Bar Association Standards Relating to the Administration of Criminal Justice: Sentencing Alternatives and Procedures vii (Tent. Draft, 2d ed. 1979). That is, the aim was to chart a middle course between mandatory sentencing by the legislature and unfettered discretion in the courts. The legislature would establish a "guideline drafting agency" to devise sentencing criteria, alternatives and statutory ranges for offenses, § 18–2.1, id. at 5, and the sentenc-

ing court would be required to impose a sentence within that range unless aggravating and mitigating circumstances justified a greater or lesser term of imprisonment, § 18–3.2, *id.* at 72–73. While the report recommended that the legislature establish maximum terms for individual offenses, § 18–4.2, *id.* at 84, minimum terms were considered more appropriately left to the guideline drafting agency and the sentencing court, § 18–4.3, *id.* at 87–88.

Each of these reform proposals had two basic aims: "(1) to make sentencing policy more *explicit* * * * and (2) to make sentencing policy more *rational,* so that sentences can be grounded in sound principles of ethics, logic, law, and resource allocation." Forst and Wellford, "Punishment and Sentencing: Developing Sentencing Guidelines Empirically From Principles of Punishment," 33 *Rutgers L. Rev.* 799, 800 (1981) (emphasis in original).

### C.

The history of New Jersey's Criminal Code mirrors the national developments traced above. Our state's effort to recodify its criminal law began in 1968 with a report of the Special Joint Legislative Committee to Study Crime and the System of Criminal Justice in New Jersey, and the subsequent adoption of its proposal to establish a commission. This commission was charged with proposing a code "to modernize the criminal law * * * to embody principles representing the best in modern statutory law * * * and to revise and codify the law in a logical, clear and concise manner." *L.* 1968, *c.* 281. After extensive work, the commission submitted its final draft and report to the Governor and the Legislature in October 1971. The New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission (2 vols. 1971).

In formulating its proposal, the Commission considered two alternative sentencing modes, which differed in the amount of discretion vested in the trial court. Tentative Draft, New

Jersey Criminal Revision Commission, §§ 2B:300–6 and 7 (January 1971). The Final Report chose to retain a strong judicial role in sentencing, but retained as well the dominant rehabilitation theme of sentencing set forth in the Model Penal Code. The Commission's pertinent comments were:

> We believe that the Court should play a major role in sentencing and that the matter should not be left entirely to the administrative penal-correctional agencies. It is desirable that the Court play a substantial role in sentencing, with authority not only to determine whether the offender should be sentenced to imprisonment but also to exercise some influence upon its length. Proposals to shift such authority to a treatment board or to vest it wholly in correctional administration were considered but were not accepted. A sound distribution of authority between the court and the administrative organs of correction, rather than a wholesale shift of power, is the end to be achieved. [II Final Report of the New Jersey Criminal Law Revision Commission: Commentary 317] [hereinafter cited as Code Commentary.]

In its view of imprisonment, it carried forward the theme of the Model Penal Code in this language:

> 2. *Presumption of No Imprisonment: Section 2C:44–1a.*
>
> This Section expresses the general principle that non-imprisonment disposition is desirable unless there appears some particular reason for institutional commitment. It is made subject to subsection d which deals with those crimes in which a reverse presumption applies. The Court will under this provision "deal with a person who has been convicted of a crime without imposing sentence of imprisonment" unless it has determined that a sentence of "imprisonment is necessary for the protection of the public" because: (a) the offender will probably commit another crime during a probationary period; (b) the offender is in need of some special type of treatment that can most effectively be provided in a correctional institution; (c) imposition of a non-incarcerative sentence would depreciate the seriousness of the crime involved, or (d) the crime is characteristic of professional criminal activity.
>
> The Code's declaration of a presumption in favor of probation or a suspended sentence unless sufficient reasons exist for imprisonment is a significant deviation from our present law. [Code Commentary, *supra*, at 324.]

Although the report was submitted in 1971, following Assembly hearings in 1972, the matter began to languish in the Legislature. There were regular and repeated urgings by Governors to give the Code priority in their legislative programs.

*See generally* Allen, "Legislative History of the New Jersey Code of Criminal Justice," 7 *Crim. Just. Q. 31, 35 (1979)*.[3]

As we have seen, events had dramatically changed perceptions of the criminal justice system by the time the New Jersey Legislature undertook final passage of the Code of Criminal Justice. It re-structured the Code to reflect these changes. The Senate Judiciary Committee Statement to S.738 (1978), which became the new Code, stated explicitly:

A. Presumptions With Regard to Sentence of Imprisonment

Prior to review by the Senate Judiciary Committee, the basic sentencing presumption provided in the Code was non-imprisonment unless imprisonment was found by the court to be necessary for the protection of the public under criteria favoring imprisonment discussed below (see 2C:44–1a). This presump-

---

[3]At the same time, the judiciary had already begun to struggle with the establishment of sentencing guidelines. Beginning in the mid-1970s, judges tried to arrive at guidelines for determining the "in or out" decision and the length of sentences. Projects around the country showed a judge what the "average" sentence was for a particular crime, according to the judge's peers' past sentences. *See* description in *State v. Whitehead,* 159 *N.J.Super.* 433 (Law Div.1978), aff'd, 80 *N.J.* 343 (1979). A state-wide project conducted over two years by the Administrative Office of the Courts was described as being

in response to a growing awareness of the need for greater equity in sentencing, i.e., that similarly situated offenders should receive similar sentences. Grave concerns had been expressed on a national basis, and in New Jersey, concerning undue sentencing disparity.

Perhaps the main reason for the problem is that the present sentencing procedure in most American jurisdictions provides the trial judge with wide discretion regarding sentencing for most crimes. This wide discretion recognizes the complexity of the sentence decision, which involves the balancing of numerous details about the offender and the offense in such a manner as to lead the judge to make the various decisions of sentencing, such as, whether to incarcerate or place in non-custodial care; which institution to send the offender to; how long the sentence should be. Undue sentence disparity arises since this wide discretion is given to judges without information advising them how to balance the factors, or how much emphasis is to be put on any one factor vis a vis the others. Undue disparity can be defined as that part of the sentence decision which is not based on properly weighted, properly related constitutionally approved information. [Report of the Sentencing Guidelines Project to the Administrative Director of the Courts 1–2 (1979) (footnotes omitted).]

That report sought to develop sentencing guidelines as a tool to improve or structure the use of discretion.

tion of non-imprisonment was deleted by the committee except with regard to first offenders convicted of an offense of the third degree or less (see 2C:44–1e). The committee retained a provision establishing a presumption of imprisonment for those convicted of an offense of the first or second degree (see 2C:44–1d). [Senate Judiciary Committee Statement to Senate, No. 738 with Senate Committee Amendments (May 15, 1978) *reprinted in* 7 *Crim. Just. Q.* 53, 62 (1979).]

## Professor Robert E. Knowlton, the Chairman of the Criminal Law Revision Commission, said:

Under the prior New Jersey statutes sentencing courts had broad discretion to impose penalties ranging from probation or fines to long prison sentences. This discretion was exercised without formal guidelines, although the appellate courts' review of sentences, aided by judicial seminars, did establish some relevant factors as well as some uniformity of results. If imprisonment was imposed, for example, the judge was required to establish minimum and maximum terms within the range permitted by the statute.

The commission report attempted to limit judicial discretion in a variety of ways including the establishment of presumptions regarding imprisonment, fines, and restitution,[87] as well as the criteria for overcoming them. * * *

The statute codifies some of the methods of the commission report but with several significant changes and additions. It carries the presumptions one step further by *presuming specific terms of incarceration for each category of crime.*

---

[87] [T]he commission recognized a presumption in favor of imprisonment where a statute outside of the Code provided for a mandatory sentence. Certain statutes within the Code also carried a presumption of imprisonment. *See id.,* II Final Report: Commentary, *supra* note 10, at 325–27 (1971). [Knowlton, "Comments Upon the New Jersey Penal Code," 32 *Rutgers L. Rev.* 1, 15 & n. 87 (1979) (other footnotes omitted) (emphasis supplied).]

## Governor Byrne, upon signing the new law, stated:

This legislation will take us a significant step toward swift and sure punishment for crimes against persons and property.

* * * * * * * *

[In sentencing,] the judge is *presumed* to impose a mid-range sentence * * * unless he sets down certain specific mitigating or aggravating circumstances.

This Criminal Code is intended to make sentencing more definitive * * *. It is designed to reduce the possibility of one judge giving a stiff sentence and another a light sentence for similar crimes. [Statement of Gov. Byrne, August 10, 1978 (emphasis supplied).]

In its structure the New Jersey Code most closely resembled the proposal set forth in the report of the Twentieth Century Fund for "presumptive sentencing." Under that scheme, the legislature would break crimes down into sub-categories, estab-

lish degrees of severity, determine how much the presumptive first offender sentence would be increased for succeeding convictions, define specific aggravating or mitigating factors, and provide that "[o]nly in truly extraordinary and unanticipated circumstances would the judge be permitted to deviate from the presumptive sentence *beyond* the narrow range permitted by an ordinary finding of aggravating or mitigating factors." Fair and Certain Punishment, *supra*, at 21 (emphasis in original). It also closely resembles a

model for sentencing based on notions of proportionality and desert. The model would have these main features:

—The primary criterion for the severity of punishment would be the gravity of the defendant's crime or crimes. His supposed likelihood of offending again ought not to determine the penalty.

—Sentencing discretion would be regulated through standards that prescribe the quantum of punishment for different species of criminal conduct. These standards could take the form of "presumptive" dispositions. For each gradation of seriousness, a normally recommended sanction would be set. Offenders convicted of crimes of that gravity would ordinarily receive that quantum of punishment. However, variations would be permitted when there were circumstances of mitigation or aggravation. [von Hirsch, "Utilitarian Sentencing Resuscitated: The American Bar Association's Second Report on Criminal Sentencing," 33 *Rutgers L. Rev.* 772, 773 (footnote omitted).]

While, as we shall see in *State v. Hodge*, 95 N.J. 369, 373–74 (1984), also decided today, the Legislature may not originally have crafted its statutory presumption with the precision necessary to define penal consequences, the overall thrust of the new Code with its focus upon the gravity of the offense and not the blameworthiness of the offender was quickly felt. In 1979, 42% of offenders were incarcerated. By 1982, about 51% of all 2C sentences were prison sentences and 40% of State prison terms included parole ineligibility terms. Further, of those offenders convicted of first degree crimes during the year 1982, 96% were imprisoned, including 89% of those convicted of aggravated sexual assault and 96% convicted of robbery. Profile of Sentences Rendered During 1982 (Administrative Office of the Courts, March 1983).

Governor Kean has estimated that the number of prison cells required in New Jersey will go from 8,265 in 1982 to 14,990 by

the year 1988. Statement of Governor Kean, "Prison Overcrowding: A Plan of Action" 5 (April 1982); *see also* Governor's Management Improvement Plan, Department of Corrections: The Correctional System (September 1983). All recognize that such changes may not relieve society of the anxieties of violent street crime. Bazelon, "Missed Opportunities in Sentencing Reform," 7 *Hofstra L. Rev.* 57 (1978). But to fail to seek " 'sentencing reform until society is reformed' is to direct attention away from the significant steps government can take *now* to make the criminal justice system fairer and more equitable." Kennedy, *supra*, 7 *Hofstra L. Rev.* at 8 (emphasis in original).

## II.

### A.

Our primary focus is on the presumption of imprisonment of *N.J.S.A.* 2C:44–1(d) and the presumptive sentences of 2C:44–1(f)(1). *N.J.S.A.* 2C:44–1(d) reads:

> The court shall deal with a person who has been convicted of a crime of the first or second degree by imposing a sentence of imprisonment unless, having regard to the character and condition of the defendant, it is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others.

To understand the role of this provision it is essential to look closely at the sentencing provisions of the Code. A step-by-step analysis not only helps clarify legislative intent, *see State v. Maguire*, 84 *N.J.* 508 (1980), but also focuses attention on how trial courts must proceed under the new law.

The Code classifies offenses into four degrees of crimes and two grades of disorderly persons offenses. *N.J.S.A.* 2C:1–4; 2C:43–1. The Legislature has established a permissible range of sentence for each degree of crime. 2C:43–6(a).[4] A few mandatory punishments are also dictated, including three years' im-

---

[4]There are separate sentencing terms for murder and kidnapping. *N.J.S.A.* 2C:11–3(b); 13–1(c). The capital punishment scheme is set out at 2C:11–3(c)–(e) and 2C:49–1 to –12.

prisonment for violating 2C:43–6(c) (Graves Act), and mandatory fines payable to the Violent Crimes Compensation Board under 2C:43–3.1.

Augmenting the ordinary sentencing scheme are several dispositional alternatives, including pretrial intervention programs (PTI), 2C:43–12 to –22, and specialized treatment under the sex offender provisions, 2C:47–1 to –7.

Before imposing sentence the court must order a presentence investigation and report. *N.J.S.A.* 2C:44–6; *R.* 3:21–2. The authorized dispositions for the criminal defendant are listed in 2C:43–2. These include imprisonment, fines, restitution, and probation. Furthermore, the court retains its authority to invoke civil penalties, including the power to revoke driving privileges, decree forfeitures, and remove officeholders. 2C:43–2(c) and (d).

■ The dispositions listed in 2C:43–2 are not self-executing. The authority to impose any of them and the guidelines to be used are found elsewhere in the Code. For example, the court derives its authority to remove a person from office not from 2C:43–2(d) but from 2C:51–2(b). Similarly, it is 2C:45–1, not 2C:43–2(b), that gives the guidelines and requirements for probation. It is of critical importance to the present case to understand that 2C:43–2(b) does not of itself give the court the power to suspend sentence. That power is granted in Chapter 44 of the Code. 2C:43–2, then, is not the first stop for a court when it sentences. Absent diversion through PTI or another program, a sentencing court must first turn to 2C:44–1(d).

■ 2C:44–1(d) creates a presumption of imprisonment for anyone convicted of a first or second degree crime. Conversely, first time offenders convicted of crimes other than first or second degree crimes receive the benefit of 2C:44–1(e). This requires the court not to imprison such an offender unless, using the aggravating factors in 2C:44–1(a) as guidelines, the court feels imprisonment is necessary to protect the public.

 The presumption of imprisonment in *N.J.S.A.* 2C:44–1(d) differs from a mandatory sentence. *See State v. Des Marets,* 92 *N.J.* 62 (1983). Although it did not recommend a general presumption, the New Jersey Criminal Law Revision Commission described such a presumption as leaving "a residuum of power in the sentencing court not to imprison in those few cases where it would be entirely inappropriate to do so." Code Commentary, *supra,* at 326. What the Legislature had in mind was that a finding of guilt "would predictably incur a particular sentence unless specific mitigating or aggravating factors are established." Fair and Certain Punishment, *supra,* at 20. Judges would be left with "some degree of guided discretion" to deal with the particular crime and criminal. *Id.* at 19.

 The residuum of power is to be exercised only under the narrow exception of the statute, that is, when "having regard to the character and condition of the defendant, [the court] is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others." 2C:44–1(d). This standard is met only in "truly extraordinary and unanticipated circumstances," Fair and Certain Punishment, *supra,* at 21, the exceptional case, that case where it can be said, in Chief Justice Hughes' words, that "the human cost of such deterrence in this instance is too great." *State v. Harris,* 70 *N.J.* 586, 596 (1976) (restitution as condition of probation vacated for struggling mother of five). *See also State v. Velazquez,* 104 *N.J.Super.* 578, 585 (App.Div.1969), aff'd o.b., 54 *N.J.* 493 (1969) (Gaulkin, J.A.D., dissenting) ("The blow to this man and his family, including his innocent children, is far more devastating than the problematical incidental damage it may do to organized gambling. If this man is not entitled to probation, I do not know who could be."). *Cf. State v. Tumminello,* 70 *N.J.* 187 (1976) (balance of custodial sentence suspended when defendant's health drastically deteriorated). Absent a proper determination of "serious injustice" considering the character and condition of the defendant, the trial court must impose a

custodial sentence. *State v. Gerstofer,* 191 *N.J.Super.* 542 (App. Div.1983) (*per curiam* ).

█ Having determined that imprisonment is mandated, the trial judge must impose the appropriate sentence found in *N.J.S.A.* 2C:44–1(f)(1).[5] Again, this "presumption" leaves the court the discretion to adjust the sentence, but only within certain strictures. For each degree of crime the Code establishes ordinary sentences within the maximum and minimum range found in 2C:43–6(a). The court undertakes an examination and weighing of the aggravating and mitigating factors listed in 2C:44–1(a) and (b). If, on balance, there is a preponderance of aggravating factors, the court may impose sentence up to the maximum for the degree of the offense as provided in 2C:43–6(a); if a preponderance of mitigating factors, it may sentence down to the statutory minimum. For example, for a crime of the second degree the ordinary sentence is seven years. If there is a preponderance of aggravating factors, the court may sentence a defendant to a term of ten years; if there is a preponderance of mitigating factors, the sentence may be a term of five years.

█ When weighing the factors involved in a first or second degree offense, the court may become "clearly convinced" that the mitigating factors "substantially outweigh" the aggravating ones. If that is so and the interest of justice demands it, 2C:44–1(f)(2) gives the court the authority to sentence the defendant to a prison term appropriate for a crime one degree lower than that of the conviction. On the other hand, if the court is "clearly convinced" that the aggravating factors "substantially outweigh" the mitigating ones, it may order a period of parole ineligibility pursuant to 2C:43–6(b).

---

[5]The presumptive sentence for first degree crimes is 15 years, for second degree crimes 7 years, for third degree crimes 4 years, and for fourth degree crimes 9 months. *N.J.S.A.* 2C:44–1(f)(1).

■ The Code requires that the court look at the individual offender in the case of extended terms of imprisonment, a second tier of sentencing provisions. Extended terms are imposed at the discretion of the court upon application by the prosecutor and notice to the defendant. 2C:44–3; 2C:44–6(e). However, an extended term is mandatory for second-time Graves Act offenders. 2C:43–6(c); 2C:44–3(d). As we described the system in *Maguire:*

> Under *N.J.S.A.* 2C:44–3, a defendant convicted of a crime of the first, second or third degree may be sentenced to an extended term only if the sentencing court expressly finds that the defendant is a persistent offender, that he is a professional criminal or that he committed the crime for pay, as those terms are defined in the statute. The central focus of these enhancement criteria is on offender-related characteristics. [84 *N.J.* at 516–17 (footnote omitted) (certain fourth degree crimes added by *L.*1981, *c.* 31).]

The sentence ranges for extended terms are set forth in 2C:43–7(a). The extended term scheme also provides for parole ineligibility terms, 2C:43–7(b) and (c), and presumptive sentences. 2C:44–1(f)(1).

■ After sentencing, the State may appeal under *N.J. S.A.* 2C:44–1(f)(2) when either (a) the court sentenced defendant to a term appropriate to a crime one degree lower than the conviction, or (b) the court exercised its residuum of discretion under 2C:44–1(d) and gave defendant probation or a noncustodial sentence. The defendant, of course, may also appeal. The court is generally given the discretion to order that sentences be served consecutively or concurrently. 2C:44–5. The court must file a statement of reasons for disposition of the case pursuant to *R.* 3:21–4 and *R.* 3:29.

For prison sentences of one year or more, the court commits defendant to the custody of the Commissioner of the Department of Corrections. 2C:43–10(a). However, if defendant is less than 26 years old at the time of sentencing, he or she may be sent to a youth correctional institution to serve an indeterminate term. Under 2C:43–5, Graves Act convictions may not be for indeterminate terms, but may be served at a youth correctional institution. *See State v. Des Marets,* 92 *N.J.* 62 (1983), for

treatment of indeterminate sentences under prior law. Once in prison, defendant's sentence is controlled by the Parole Act of 1979. *N.J.S.A.* 30:4–123.45 to –123.69. *See generally In re Trantino Parole Application,* 89 *N.J.* 347 (1982). Defendants may move to reduce their sentences under *R.* 3:21–10, and may seek to have a custodial sentence changed to one for treatment for drug or alcohol abuse. *R.* 3:21–10(b)(1).

## B.

As we have seen, central to the reform of sentencing procedures is provision for appellate review of sentences to provide a greater degree of uniformity. Even without statutory authority, New Jersey courts exercised the power to modify sentences that were manifestly excessive, although within statutory limits. *See* Part I(A), *supra.* Provision for appellate review of sentences at the request of the State was not part of the Model Penal Code or the original 1971 version of the New Jersey Criminal Code. The 1978 enactment of 2C:44–1(f)(2) provided for State appeal when the court sentenced a defendant to a term appropriate to a crime one degree lower than the conviction. *L.*1978, *c.* 95. It was the 1979 "consensus amendments" that added the present provision allowing appeal from, a probationary or noncustodial sentence. *L.*1979, *c.* 178, § 93.

In fashioning a sentence review act, jurisdictions have varied the standards under which appellate courts shall act. The Uniform Law Commissioners' Model Sentencing and Corrections Act established a sentencing guideline system and allowed appeals if the sentencing court misapplied or deviated from the guidelines. *Id.* at § 3–208, 10 *U.L.A.* 217–18 (Supp.1983). Pennsylvania provides for broader review: The appellate court "shall vacate the sentence and remand" if the sentencing court misapplied the guidelines, or sentenced within the guidelines when the circumstances of the case make that "clearly unreasonable," or ordered a sentence outside the guidelines that was

unreasonable. 42 *Pa.Cons.Stat.Ann.* § 9781(c) (1982). Minnesota authorizes sentence review when the sentence is "inconsistent with statutory requirements, unreasonable, inappropriate, excessive, unjustifiably disparate, or not warranted by the findings of fact." *Minn.Stat.* § 244.11 (West Supp.1983).

Our Criminal Code provides this guidance as to the standard to be applied:

> Any action taken by the court in imposing sentence shall be subject to review by an appellate court. The court shall specifically have the authority to review findings of fact by the sentencing court in support of its findings of aggravating and mitigating circumstances and to modify the defendant's sentence upon his application where such findings are not fairly supported on the record before the trial court. [*N.J.S.A.* 2C:44–7.]

Its language focuses on the defendant's appeal and does not specifically address State appeals of probationary or downgraded sentences.

Our traditional mode of review was set forth in *State v. Leggeadrini,* 75 *N.J.* 150, 157 (1977): "[T]he scope of appellate review is normally limited to the question of whether that discretion has been abused by the imposition of a sentence which is manifestly excessive under the particular circumstances of the case." *Leggeadrini,* however, was based on the traditional rationales for sentencing. What priorities should be given to the purposes and goals of sentencing were not clearly defined under pre-Code theories of sentencing and sentence review. Furthermore, we emphasized in *Leggeadrini* that sentencing judges must consider the aggravating and mitigating circumstances with respect to both the offender and the offense. *Id.* at 157. Within this enormous range of sentencing discretion it was not possible to codify in the phrase "abuse of discretion" the principles that should guide an appellate court.

We sought to clarify that phrase in *State v. Whitaker,* 79 *N.J.* 503 (1979). We analogized the scope of appellate review of sentencing decisions to appellate review of basic trial level findings:

> These strictures upon appellate supervision have been expressed in various ways, all oriented to the concept of a clear and compelling finding of a

miscarriage of justice. In *Sweeney v. Pruyne,* 67 *N.J.* 314 (1975), for instance, and in *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227 (1971), the rule was put in terms of such shock to the judicial conscience as to be convincing that upholding the action reviewed would be "manifestly unjust." 58 *N.J.* at 236. Our rule limiting judicial interference with a jury verdict forbids it unless it "clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a).

In *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474 (1974), we had occasion to review the limited scope of appellate review of basic trial level findings as follows:

"[O]ur courts have held that the findings on which it is based should not be disturbed unless ' * * * they are so wholly insupportable as to result in a denial of justice,' * * *." [79 *N.J.* at 514.]

Yet it remained difficult to define with precision what these phrases meant. As Professor Davis said in another context: "Whatever impression a literal-minded reader may get from the words in a statute book, the plain reality is that the substantial-evidence rule as the courts apply it is a variable. It is made of rubber, not of wood." 4 K. Davis, Administrative Law Treatise § 29.02, at 126 (1958).

In fashioning an appropriate standard to communicate the desired intensity of review, we must give content to a phrase such as "clear abuse of discretion." We believe that content may be found in other analogous areas of appellate review.

First, we will always require that an exercise of discretion be based upon findings of fact that are grounded in competent, reasonably credible evidence. *State v. Johnson,* 42 *N.J.* 146, 162 (1964); *see also N.J.S.A.* 2C:44–7.

Second, we will always require that the factfinder apply correct legal principles in exercising its discretion. In *State in the Interest of C.A.H. and B.A.R.,* 89 *N.J.* 326 (1982), we set aside a discretionary decision not to waive juvenile jurisdiction because the record showed that the "analytical step that was not taken below"—the balancing of juvenile rehabilitation against the protection of society—was required by the statutory framework guiding the decisionmaker. 89 *N.J.* at 344. *See also In re Trantino Parole Application,* 89 *N.J.* 347, 373 (1982) (discretionary decision to parole without consideration of statutory stan-

dard concerning punitive aspects of sentence would be improper); *In re Polk License Revocation,* 90 *N.J.* 550 (1982) (factfinding agency must use correct evidentiary standard in determining issues).

Third, we will exercise that reserve of judicial power to modify sentences when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience. *Whitaker,* 79 *N.J.* at 512. We anticipate that we will not be required to invoke this judicial power frequently.

We have used this three-part test in defining the phrase "patent and gross abuse of discretion" by which we restricted appellate supervision of a decision to admit a defendant to a pretrial supervisory program. We required a showing that the decision either "(a) was not premised upon a consideration of all relevant factors, (b) was based upon a consideration of irrelevant or inappropriate factors, or (c) amounted to a clear error in judgment." *State v. Bender,* 80 *N.J.* 84, 93 (1979). *See also State v. Humphreys,* 89 *N.J.* 4, 13 (1982) (standards for admission to conditional discharge under Controlled Dangerous Substances Act). It is similar in content to the standard for review of agency factfinding: "[W]e will not upset a determination * * * in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the civil service act." *Campbell v. Department of Civil Service,* 39 *N.J.* 556, 562 (1963).

In this context of appellate review of sentencing, then, an appellate court can perform these review functions within its traditional mode. It can (a) review sentences to determine if the legislative policies, here the sentencing guidelines, were violated; (b) review the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and (c) determine whether, even though the court sentenced in accordance with the guidelines, nevertheless the application of the guide-

lines to the facts of this case makes the sentence clearly unreasonable so as to shock the judicial conscience.

■ We must avoid the substitution of appellate judgment for trial court judgment. What we seek by our review is not a difference in judgment, but only a judgment that reasonable people may not reasonably make on the basis of the evidence presented:

> [T]he error which warrants modification of a sentence must amount to more than a difference of opinion or individual sentencing philosophy. The sentencing objectives are spelled out in the Code. It is deviation from those objectives, in view of the standards and criteria therein set forth, which constitutes error. To hold otherwise would allow for ad hoc, instinctive decisions on appeal which could result in merely perpetuating disparity on a different level and which would certainly thwart the development of defined, objective standards. [*People v. Cox,* 77 *Ill.App.*3d 59, 65, [32 *Ill.Dec.* 946, 952] 396 *N.E.*2d 59, 65 (App.Ct.1979), rev'd due to conflict between statute and court rule, 82 *Ill.*2d 268, [45 *Ill.Dec.* 190], 412 *N.E.*2d 541 (Sup.Ct.1980).]

■ Pronouncement of judgment of sentence is among the most solemn and serious responsibilities of a trial court. No word formula will ever eliminate this requirement that justice be done. There is no room for trial or appellate courts to consider the public perceptions of sentences: "Judicial recognition of or action upon public opinion against a particular defendant cannot be tolerated in our criminal justice system." *State v. Humphreys,* 89 *N.J.* 4, 15 (1982). We are confident that our judges are people of "fortitude, able to thrive in a hardy climate." *Craig v. Harney,* 331 *U.S.* 367, 376, 67 *S.Ct.* 1249, 1255, 91 *L.Ed.* 1546, 1552 (1947). Our new Code reflects a delicate balance between discretion and fixed sentencing. An independent judiciary is its fulcrum. When conscientious trial judges exercise discretion in accordance with the principles set forth in the Code and defined by us today, they need fear no second-guessing. *Humphreys,* 89 *N.J.* at 16.

■ In sum, then, appellate review of a sentencing decision calls for us to determine, first, whether the correct sentencing guidelines, or in this case, presumptions, have been followed; second, whether there is substantial evidence in the record to

support the findings of fact upon which the sentencing court based the application of those guidelines; and third, whether in applying those guidelines to the relevant facts the trial court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors.

### III.

We have announced in this case, for the first time, the standards that shall guide sentencing and appellate courts under the new provisions of the Criminal Code. "Viewed within this analytical framework—perhaps not starkly evident before today's decision," *State in the Interest of C.A.H. and B.A.R.,* 89 *N.J.* 326, 346 (1982), we determine that the trial court reached an incorrect decision. We reach this conclusion because analysis of the record shows the trial court did not apply the sentencing guidelines set forth in the Code. Instead, the sentencing court followed traditional sentencing processes as defined in *Ivan, Leggeadrini* and *Whitaker.*

In the colloquy before sentencing, counsel for the defendant focused upon the aggravating and mitigating factors set forth in *N.J.S.A.* 2C:44–1(a) and (b). Counsel emphasized defendant's alcoholism, his progress towards rehabilitation and the unlikelihood of recurrence. The court in its oral sentence was conscious of the statutory presumption, stating "[h]ere today I am looking at the presumption of incarceration." Yet we believe that he balanced this against a preponderance of mitigating factors and not the single factor of "serious injustice" as the Code requires. He balanced rehabilitation as a part of the "in or out" decision when he told defendant, "I recognize that you are salvageable." He considered the other *Ivan* and *Leggeadrini* factors of protecting the community and expressing the community's retribution through punishment.

In a written statement of amplified reasons pursuant to *R.* 3:29, the court reviewed the aggravating and mitigating factors that he considered "based upon the standard sentencing crite-

ria." He recognized that the crime was violent, that the use of the knife was threatened, that the sexual act was degrading and unprovoked, and that the victim incurred serious emotional harm. He noted defendant's paradoxical apology to the victim and his concern at the time for her belongings and her baby, and felt he had "never seen a defendant give the appearance by conduct and attitude of abject remorse this defendant exhibits."

The trial court found several aggravating factors including that the crime was committed in a cruel manner and the victim was substantially incapable of exercising normal physical resistance. Weighing against these were mitigating factors, including the defendant's alcohol and drug problems, his clean record, the unlikelihood that he would commit another crime, and his willingness to cooperate with law enforcement authorities. The trial court concluded:

> Nevertheless, defendant gives every appearance of true remorse for his conduct. He has emotionally damaged a young woman and understands this. He appears to desire to control the causative reasons for his conduct—alcohol and substance abuse. In fact, he appears well on the way to such control and recognition by putting his life together. I have considered a prison sentence recognizing that there is no program within our institutions which can meet the defendant's special needs. He is now a fit candidate under court rule for treatment at a facility outside the prison system, where his further efforts could be tested and evaluated. The court recognizes the need to punish and to deter, but is satisfied, based upon the history and character of the defendant, the nature and circumstances of the crimes, the risk defendant presents, the lack of special institutional facilities requires the following sentence be imposed.

We do not decide whether this would have been an appropriate sentence under the pre-Code law of *Ivan* and *Whitaker*, but the individualized focus upon the capacity of an offender to be rehabilitated was an essential part of that analysis.

█ Yet the Code requires an inexorable focus upon the offense when formulating a sentence. This crime was violent and degrading. The defendant stopped the victim at knifepoint on a city street, threatened to rape her, and forced her to submit to what was for her a horrible sexual indignity. A sexual assault upon a woman walking her child on one of our city streets represents the kind of offense that the Legislature had

in mind when it created the presumption of imprisonment. *N.J.S.A.* 2C:14–2(a)(4) makes a sexual crime with use of a weapon a crime of the first degree, the highest degree of crime, with the exception of murder, in the Code. Only when a court "having regard to the character and condition of the defendant" believes that incarceration would be a "serious injustice which overrides the need to deter such conduct by others," can a sentence of imprisonment be withheld. 2C:44–1(d). Such a conclusion cannot be reached by a simple preponderance of either aggravating or mitigating factors, for that process yields only the range of a sentence of imprisonment. *N.J.S.A.* 2C:44–1(f)(1). Nor can it be based upon a quantitative analysis of the number of factors to be balanced. The factors are not interchangeable on a one-to-one basis. The proper weight to be given to each is a function of its gravity in relation to the severity of the offense.

The determination of "serious injustice" that averts imprisonment is a qualitatively different process. Defense counsel argued that the case was "balanced and poised in terms of the aggravating and mitigating factors." Under *N.J.S.A.* 2C:44–1(f)(2) a court must be "clearly convinced that the mitigating factors substantially outweigh the aggravating factors" to downgrade a sentence. In *Hodge,* we hold that since the Code requires this high standard even to downgrade, it "must have contemplated an even higher standard to give confidence to the 'in or out' decision." *Hodge,* 95 *N.J.* at 376.

The broad range of community support for Roth and his previously blameless life evoke compassion. But even granting the trial court's conclusion that his case was "much more difficult than some," he is not the truly exceptional defendant or one caught up in a maelstrom of "engulfing circumstances." *Leggeadrini,* 75 *N.J.* at 160. It is unfortunate, but not exceptional, that his youthful dependence on drugs and alcohol triggered his criminal behavior. Many crimes arise out of drug and alcohol use. His situation, while regrettable, is not rare. It has not

been shown as to him that "the human cost * * * is too great." *State v. Harris,* 70 *N.J.* 586, 596 (1976).

As noted, we recognize that this construction of the statute was not "starkly evident" before today. We believe, however, that we have correctly construed the legislative intent in the sentencing provisions of the Code. The paramount goal of sentencing reform was greater uniformity. To that end, the Code channels discretion. Uniformity could not be achieved within the framework of pre-Code sentencing processes. We have repeatedly emphasized that the New Jersey Criminal Code represents a "clean break with the past." *State v. Butler,* 89 *N.J.* 220, 226 (1982). The philosophies and processes of the past cannot co-exist with the Code.

Since the guidelines for sentencing were not followed below, the sentence must be set aside. The judgment of the Law Division is reversed and the cause remanded for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.