**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2844-21

IN THE MATTER OF S.D.,
TOWNSHIP OF FREEHOLD
POLICE DEPARTMENT.

_____

Argued January 30, 2024 – Decided February 22, 2024

Before Judges Mayer, Enright and Paganelli.

On appeal from the New Jersey Civil Service Commission, Docket No. 2021-1768.

Christopher A. Gray argued the cause for appellant (Sciarra & Catrambone, LLC, attorneys; Christopher A. Gray and Deborah Masker Edwards, of counsel and on the briefs).

Brian J. Chabarek argued the cause for respondent Township of Freehold Police Department (Davison Eastman Muñoz Paone, PA, attorneys; Brian J. Chabarek, of counsel and on the brief; Timothy C. Moriarty, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant S.D. appeals from a March 7, 2022 final agency decision by respondent New Jersey Civil Service Commission (Commission), adopting a January 21, 2022 initial decision by an administrative law judge (ALJ), upholding S.D.'s termination as a police officer with respondent Township of Freehold Police Department (Department).  We affirm.

We recite the facts from the hearings conducted by the ALJ judge.  S.D. is married and has three children.  S.D.'s wife was enrolled in New Jersey's Medicinal Marijuana Program to treat various medical conditions.  On November 30, 2020, S.D.'s wife filled a prescription for cannabis in a smokable form.

On December 15, 2020, S.D.'s wife informed S.D. she did not want to smoke prescribed cannabis alone.  S.D. agreed to remain with his wife while she smoked.  Because the couple had three young children, S.D. and his wife sat in their car so the children would not see their mother smoking.

The couple sat inside their car for thirty to forty minutes while S.D.'s wife smoked.  Given the cold weather, they initially sat inside the car with the windows closed and the heater running.  When the car began to fill with smoke, they "cracked [the] window[s] a little bit[,] just to get the air flow[] moving."

A-2884-21

The next evening, December 16, S.D. again sat inside the car with his wife so she could smoke prescribed cannabis.

On December 17, 2020, the Department selected S.D. for a random drug test. S.D. signed the required forms for the drug test and provided a urine sample. The Department sent the sample to the New Jersey State Toxicology Lab (NJSTL) for testing and retained a second "split" sample.

About a month later, the NJSTL reported S.D.'s sample contained cannabis metabolites in a concentration of 16.3 ng/ml, exceeding the 15 ng/ml threshold and yielding a positive result. Because the NJSTL testing indicated a positive result, S.D. sent the split sample to a different laboratory, NMS Labs, for independent testing. The results of the split sample revealed cannabis metabolites in a concentration of 14.68 ng/ml.

Based on the NJSTL positive drug test, on February 17, 2021, the Department issued a Preliminary Notice of Disciplinary Action (PNDA), suspending S.D. without pay. The charges against S.D. in the PNDA included the following: insubordination; inability to perform duties; conduct unbecoming a public employee; neglect of duty; and other sufficient cause, including violations of rules contained in the Department's Manual.

3

On May 12, 2021, the Department issued a Final Notice of Disciplinary Action, terminating S.D.'s employment as of February 17, 2021. S.D. waived his right to a departmental hearing on the charges and appealed his termination directly to the Office of Administrative Law (OAL). As part of the OAL proceedings, the parties stipulated to the validity of the process by which S.D.'s sample was selected, acquired, transported, retained, and tested.

The ALJ held hearings on three dates in September 2021. Dr. George Jackson, executive director of laboratories for the Office of the Chief State Medical Examiner, testified as a forensic toxicology expert on behalf of the Department. Dr. Daniel Isenschmid, a forensic toxicology expert with NMS Labs, testified on S.D.'s behalf. The ALJ also heard testimony from Detective Lieutenant Scott Hall with the Department's Internal Affairs Unit, the Department's Chief of Police, S.D., S.D.'s wife, and S.D.'s character witnesses.

Dr. Jackson testified S.D.'s first sample underwent initial screening at NJSTL. The initial screening test identified the presence of cannabinoids at 53.2 ng/ml which was above the 20 ng/ml threshold for a presumptive positive result. This presumptive positive test necessitated a follow up gas chromatography/mass spectrometry (GC/MS) test. The GC/MS test is a qualitative and quantitative analysis for the presence of 11-Carboxy-THC (THC)

and measures for THC concentrations above the 15 ng/ml threshold to report a positive result. The 15 ng/ml level is an industry standard used by the State of New Jersey and designated to include a testing subject's accidental exposure to THC. According to the GC/MS test performed by the NJSTL, S.D.'s sample contained cannabis metabolites in a concentration of 16.3284 ng/ml. While Dr. Jackson testified a positive finding may be attributable to a medication listed on a subject's medication information sheet, he stated S.D. reported no medications.

The ALJ also considered Dr. Isenschmid's testimony. The doctor explained NMS Labs conducted a liquid chromatography tandem mass spectrometry (LCMS) test on S.D.'s split sample. According to Dr. Isenschmid, the LCMS test of S.D.'s split sample contained cannabis metabolites in a concentration of 14.68 ng/ml, which was below the threshold for a positive result.

However, Dr. Isenschmid further testified the result obtained by NMS Labs fell within the margin of error of the first sample's test and "confirmed the results of the first test" by the NJSTL. Thus, Dr. Isenschmid testified both results were "considered analytically the same." Despite the difference in the concentration of cannabis found by each laboratory, the doctor testified the results from the NJSTL were valid and S.D.'s sample above 15 ng/ml constituted

5

a positive result. S.D. never challenged the accuracy of the Department's sampling methods or procedures or the NJSTL's test results.

Dr. Isenschmid also testified regarding a 2015 study on passive inhalation exposure to cannabis and resulting positive drug screens. Dr. Isenschmid conceded the 2015 study was performed under "extreme conditions" and he "d[id]n't pretend to know what conditions . . . were present at the time of . . . [S.D.'s] smoke exposure."

Dr. Isenschmid explained he was unable to opine on S.D.'s passive inhalation of cannabis smoke leading to a positive test result without additional information. The doctor testified he required critical information, such as the duration between exposure to the marijuana and the timing of S.D.'s test sample, the environment where the marijuana was smoked, the ventilation in the area the marijuana was smoked, the amount of marijuana smoked, and the potency of the marijuana smoked to offer an opinion on passive inhalation by S.D. and his positive test result.

Detective Lieutenant Hall, who was in charge of the Department's random drug testing policy and familiar with the Attorney General's directives regarding random drug testing from 2018 to the present, also testified. Hall testified the Attorney General's drug testing policy in effect when S.D. submitted a urine

A-2884-21

sample required termination for any officer receiving a positive test result. Hall explained officers are required to sign an acknowledgement regarding the consequences flowing from a positive test result and S.D. did so on December 17, 2020. Additionally, Hall stated the Department had a policy requiring random drug screening for officers and S.D. signed the policy. Hall further testified the Department required officers to list medications taken fourteen days prior to a random drug screen on a medication information sheet.

Upon receipt of S.D.'s positive test result, Hall notified the Department's Chief of Police and the Monmouth County Prosecutor's Office. S.D. also received notice of the result. Hall testified S.D. offered no explanation for the positive test at that time.

The ALJ also heard live testimony from several character witnesses on S.D.'s behalf. Further, the ALJ accepted and considered written character witness statements. The character witnesses described S.D. as a respected member of the Department with no prior disciplinary history.

S.D. also testified. S.D. explained he signed the Department's drug testing policies, acknowledging termination as a police officer if he tested positive for marijuana. S.D. also described the many treatments, medications, and therapies

7

prescribed to address his wife's medical issues, including Lyme disease, rheumatoid arthritis, fibromyalgia, and gastrointestinal issues.

S.D. further testified he was present when his wife smoked medicinal cannabis on December 15 and 16, 2020 and felt no effects from the smoke on either night.

S.D. then explained he was selected for a random drug test upon reporting to work on December 17, 2020. Prior to providing a urine sample, S.D. signed the required consent forms. Under the Department's policy, S.D. was required to complete a "Drug Testing Medication Information" form prior to providing a urine sample. The Department's policy required S.D. to "identif[y] medications (prescription and non-prescription [i.e. over-the-counter]) . . . ingested in the past fourteen days . . . ." S.D. listed no medications on his form.

On February 16, 2021, Hall informed S.D. of the positive drug test result. Hall gave S.D. an opportunity to provide an explanation for the positive test. S.D. explained he was "blown away" by the positive result because he did not use marijuana. The Department suspended S.D. and advised there would be an Internal Affairs investigation.

S.D. then met with a representative from the Police Benevolent Association (PBA). The PBA representative told S.D. to get a lawyer because

S.D. did not appear to grasp the impact of the positive test result. About a half hour into this meeting, S.D. told the PBA representative the positive drug test may have been the result of sitting in the car with his wife while she smoked medically prescribed cannabis on December 15 and 16, 2020.

During cross-examination, S.D. confirmed he was aware of the drug testing policies promulgated by the Department and the Attorney General. He further acknowledged he knew these drug testing policies required termination from the police force upon a positive test result.

On cross-examination, S.D. also explained he did not list any medications on the medication information sheet because he had not taken any medications. S.D. testified he did not indicate his wife was enrolled in the medicinal cannabis program because that information was not requested on the form.

After completing the testimony, the parties stipulated to the following facts: S.D. was not challenging the random drug testing process or acquisition of the samples; S.D. was not challenging the chain of custody of the samples; S.D. waived his right to a departmental hearing; and S.D.'s suspension commenced February 17, 2021.

On January 21, 2022, the ALJ issued a detailed written decision denying S.D.'s appeal and upholding his termination. The ALJ found all witnesses to be

credible. However, the ALJ explained "this [was] not a situation where credibility [was] a factor, but a situation where the test results, not challenged by either party, must govern." The ALJ rendered the following factual findings:

> [O]n December 15, 2020, and December 16, 2020, [S.D.] accompanied his wife in a closed vehicle for approximately thirty to forty minutes on each occasion while [she] smoked marijuana medically prescribed for her. On December 17, 2020, [S.D.] reported for work and was directed to submit a urine sample for random drug testing. As part of that process, he did not report any drug or other substance use on the prescribed document[,] which is a part of the random drug-screening process. He submitted a sample, which was divided into two parts. On February 16, 2021, [S.D.] was notified that testing of the urine sample . . . revealed that his urine was positive for cannabinoids (THC) in excess of the [fifteen] ng/m[l] cutoff under the [Office of Attorney General] and [Department] policies.

Additionally, the ALJ noted S.D. sent his split sample for testing at an independent laboratory and that laboratory concluded S.D.'s sample tested positive for cannabinoids in a concentration of 14.680 ng/ml. Regarding the split sample, the ALJ stated:

> [t]he positive-level threshold cutoff concentrations are expressly to be excluded from consideration by the lab because the purpose of the split-specimen test is merely to confirm the presence of the drug metabolite in the specimen. That is, a split specimen shall be reported as a "positive result" when the laboratory result confirms

the presence of the metabolite in the split specimen without regard to the threshold level.

Relying on prior decisions issued by the Commission, the ALJ explained "in the absence of any evidence, or even a suggestion, that the initial test produced an inaccurate result, the value of the split sample is significantly decreased."

The ALJ further determined:

> While [S.D.]'s motive in supporting his wife [was] admirable, as a police officer he showed a lack of perspicacity in dealing with the situation. As a law-enforcement officer, he knew (or should have known) that being subject to marijuana smoke (whether directly or indirectly inhaled) in a closed, confined space two times in two days for periods of thirty to forty minutes each may have resulted in adverse results in his system, fitness for duty, and ability to react in a work or emergency situation—whether or not he felt any effects from the exposure.
>
> Legality of marijuana does not necessarily demand a corresponding adjustment to the strict, zero-tolerance standards to which law-enforcement personnel are held.

The ALJ also found S.D.'s signing of the consent and acknowledgment forms put S.D. on notice that a positive drug test result would lead to termination as a law enforcement officer. The ALJ noted the testing policies adopted by the Department and the Attorney General "require[ed] random drug testing with a zero-tolerance-for drug-use," and "S.D. was aware of and knew the requirements

11

of the [Department] and the [Attorney General's] Guidelines regarding illegal drug use."

The ALJ also rejected S.D.'s argument he was not required to list his wife's medicinal cannabis use on his medication information sheet prior to the random drug test. S.D. claimed he did not need to list cannabis because it was not his medication. The ALJ found "common sense regarding the circumstances should have led [S.D.] to note his exposure to his wife's medicinal marijuana on the disclosure form."

Further, the ALJ rejected S.D.'s request for assessment of progressive discipline. The ALJ determined:

> there [was] no dispute that, intentionally or inadvertently, [S.D.] was subject to marijuana smoke. He knew it was illegal, knew the policies and procedures of the Department, and knew he was held to a higher standard as a law enforcement officer. Further, while testimony reflects that [S.D.] ha[d] no disciplinary record, test results documenting illegal drugs in the system of someone in a safety-sensitive position is a serious offense, and the penalty should reflect the same.

Based on S.D.'s status as a police officer, the ALJ concluded S.D. was held to a higher standard of conduct than ordinary public employees. Given S.D.'s sample tested above the 15 ng/ml threshold limit, as conceded by S.D.'s own toxicology expert, the ALJ sustained the Department's charges against S.D.

12

The judge explained whether S.D. exposed himself to cannabis "intentionally or inadvertently, he did not comply with the policy." Accordingly, the ALJ concluded the sustained charges "[we]re sufficiently egregious to warrant termination of [S.D.] from his position as a police officer." The ALJ expressly concluded the positive test result mandated S.D.'s termination from the Department.[1]

In his written decision, the ALJ stated: "If the . . . Commission does not adopt, modify or reject this decision within forty-five days and unless such time limit is otherwise extended, this recommended decision shall become a final decision in accordance with N.J.S.A. 40A:14-204."

On March 2, 2022, the Commission considered S.D.'s motion to modify the penalty imposed by the ALJ to a six-month suspension rather than termination. At that time, only four persons constituted membership of the Commission. Two members voted for and two members voted against the

---

[1] When he issued his written decision, the ALJ noted "the regulations for sale and distribution of marijuana to the public [had] not been perfected, nor [had] any changes been made to the [Attorney General's] policies regarding [the] usage of marijuana by law-enforcement officers." Not until about a month after the ALJ's decision did the Legislature legalize the recreational use of marijuana. See N.J.S.A. 24:6I-31 to -56. Not until almost four months after the ALJ's decision did the Attorney General issue a memorandum related to the legalization of marijuana.

motion. As a result of the Commission's tie vote, S.D.'s motion failed and the Commission did not render a decision. Thus, under N.J.S.A. 52:14B-10(c), the ALJ's decision became final on March 7, 2022.

On May 17, 2022, the Commission denied S.D.'s request for reconsideration. The Commission declined to address the motion "since the Commission did not render a decision and could not have made 'a clear material error.'"

On appeal, S.D. argues the ALJ's decision was arbitrary, capricious, and unreasonable and unsupported by credible evidence in the record. S.D. also challenges the imposed sanction of termination rather than progressive discipline. S.D. further contends the Commission erred in denying his request for reconsideration. We reject these arguments.

We accord deference to agency decisions even in circumstances where, as in this case, the ALJ's decision was "deemed adopted" by the Commission as a final decision due to an insufficient number of Commission members to review the decision. In re Hendrickson, 235 N.J. 145, 157 (2018). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccaone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369,

380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

When reviewing an agency decision, we consider: (1) whether the agency action violated "express or implied legislative policies"; (2) whether there was substantial evidence in the record to support the agency's decision; and (3) whether in applying the law to the facts, the agency reached a conclusion "that could not reasonably have been made on a showing of the relevant factors." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).

We apply a deferential standard to the review of disciplinary sanctions. In re Herrmann, 192 N.J. 19, 28 (2007). An agency's sanction will be reversed only if the "punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29. We may not substitute our own view whether a particular penalty is warranted. In re Carter, 191 N.J. 474, 486 (2007). However, we are not "bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Allstars, 234 N.J. at 158 (alteration in

15

original) (quoting Dep't of Children & Fams., Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 302 (2011)).

We first address S.D.'s argument that the Commission's decision subjecting him to termination was arbitrary, capricious, and unreasonable. S.D. argues the Department failed to present evidence supporting, let alone proving, any of the levied charges. We disagree.

The charges issued by the Department against S.D. included conduct unbecoming a police officer and other good and sufficient cause based on S.D.'s positive drug test.

Police officers commit conduct unbecoming when their conduct "has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services." Karins v. City of Atlantic City, 152 N.J. 532, 554 (1998) (quoting In re Appeal of Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960)). Additionally a finding of conduct unbecoming may be determined where the conduct "offends accepted standards of decency." Id. at 557. Such conduct "need not 'be predicated upon the violation of any particular rule or regulation. . . .'" Id. at 555 (quoting Hartmann v. Police Dep't of Ridgewood, 258 N.J. Super. 32, 40 (App. Div. 1992)).

Here, the ALJ found S.D. was a police officer and his testing positive for marijuana tended to destroy the public's trust regarding law enforcement officers who took an oath to uphold the law. The ALJ properly concluded termination for conduct unbecoming a police officer was necessary to uphold the public's respect for, and confidence in, its police officers. A "violation of the implicit standard of good behavior which devolves [around] one who stands in the public eye as an upholder of that which is morally and legally correct" is sufficient to discipline a police officer for conduct unbecoming. See Emmons, 63 N.J. Super. at 140. We discern no error in the ALJ's decision to terminate S.D. for conduct unbecoming S.D based on his positive drug test.

The Department also charged S.D. with conduct constituting other good and sufficient cause for imposing discipline. This charge was premised on S.D.'s testing positive for drugs contrary to the Attorney General's and the Department's zero-tolerance drug testing policy and in violation of provisions in the Department's Manual. Under the policies and Department's Manual, there was sufficient credible evidence in the record in support of other good and sufficient cause to impose discipline against S.D.

We also reject S.D.'s passive inhalation argument to explain the presence of cannabis metabolites in his system. Whether S.D. intentionally or

17                                                                          A-2884-21

unintentionally had cannabis in his system above the threshold level was irrelevant under the drug testing policies in effect in 2020. Under the policies, a positive drug test result required termination of a law enforcement officer. This is particularly true where, as here, S.D. submitted no evidence challenging the reliability or validity of the NJSTL's results. Indeed, S.D.'s own expert testified the NJSTL's positive test result for S.D. was valid.

Based on the undisputed record, S.D. knew the policies related to controlled dangerous substances, including cannabis. He also knew a positive drug test would result in his termination. Further, there was no expert testimony to support S.D.'s claim that his positive drug test result was attributable to passive inhalation. The ALJ thoroughly explained his reasons for rejecting Dr. Isenschmid's citation to a single study related to passive inhalation of marijuana under extreme circumstances. The ALJ also highlighted Dr. Isenschmid's own testimony stating the lack of critical information precluded the doctor's ability to opine S.D.'s positive test was attributable to passive inhalation.

We also reject S.D.'s argument that termination was too severe a sanction and progressive discipline should have been imposed. In support of his argument for progressive discipline rather than termination, S.D. relies on several unpublished cases. Rule 1:36-3 provides no unpublished decisions

18

"shall constitute precedent or be binding upon any court." Even if we were permitted to consider the unpublished cases cited by S.D., we are satisfied the cases are distinguishable as they involved charges unrelated to positive drug tests or positive drug tests for public employees who were not required to carry a firearm as part of their job duties.

Regardless of S.D.'s unblemished record, lack of any prior disciplinary history, and strong support of his fellow police officers and other character witnesses, the policies promulgated by the Department and the Attorney General unequivocally mandated termination of employment for law enforcement officers testing positive for drugs. S.D. never denied his awareness of the policies mandating termination as a law enforcement officer after a positive test result.

Additionally, the public's trust warranted S.D.'s termination as a law enforcement officer. Adherence to a high standard of conduct is an obligation that a law enforcement officer voluntarily assumes when entering public service. See Emmons, 63 N.J. Super. at 141-42. As we explained in Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965):

> [A] police officer is a special kind of public employee. His primary duty is to enforce and uphold the law. He carries a service revolver on his person and is constantly called upon to exercise tact, restraint and

good judgment in his relationship with the public. He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public.

Conduct unbecoming or other good and sufficient cause, two of the charges against S.D. sustained by the ALJ, need not be limited to an officer's violation of a policy, rule, or regulation, "but may be based merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." Emmons, 63 N.J. Super. at 140.

Further, our review is limited to whether the termination decision was "shocking" to our sense of fairness, not whether we would have reached the same decision. Here, the policies issued by the Department and the Attorney General articulated zero-tolerance for drugs. More importantly, these policies specified that a law enforcement officer who tested positive for drugs resulted in public loss of confidence in the police.

We are satisfied S.D. was aware that receipt of a positive drug test would result in mandatory termination of his employment as a police officer. Nothing in the policies issued by the Department or the Attorney General authorize imposition of a lesser sanction than termination after a positive test result. The

absence of any prior disciplinary history does not diminish the fact that S.D., as a police officer, is held to a higher standard than other public employees.

We also reject S.D.'s argument that the Cannabis Regulatory Enforcement Assistance, and Marketplace Modernization Act (CREAMMA), N.J.S.A. 24:6I-31 to -56, legalizing the recreational use of marijuana, applied to his matter. CREAMMA, effective February 22, 2021, applied prospectively per the express language of the statute. S.D. tested positive on December 17, 2020, and was terminated by the Department on February 17, 2021, prior to CREAMMA's effective date.

Nor does the Attorney General's revised Law Enforcement Drug Testing Policy apply to S.D.'s matter. The revised policy became effective in February 2023, and the conduct leading to S.D.'s termination occurred two years before the Attorney General's revised drug testing policy.

We also reject S.D.'s argument the ALJ's decision should not have become final based on the two-two vote before the Commission. The traditional standard of deference applies to an ALJ's decision timely "deemed adopted" as a final agency decision. See Hendrickson, 235 N.J. at 149. We will affirm an ALJ's decision "deemed adopted" as a final agency decision if the ALJ's decision, particularly in the context of imposing appropriate disciplinary sanctions, is

supported by sufficient credible evidence even if we might have reached a different decision. Id. at 150.

Where the Commission is unable to render a final decision due to the lack of a quorum or, as in this case, there is a split vote of the Commission's membership, the ALJ's decision is "deemed adopted" as the agency's final decision. N.J.S.A. 52:14B-10(c). Under the circumstances here, we are satisfied the Commission's adoption of the ALJ's January 21, 2022 decision as a final agency decision was not arbitrary, capricious, or unreasonable.

We also reject S.D.'s argument that the Commission erred in denying reconsideration of his appeal. Because the ALJ's decision was "deemed adopted" by the Commission as its final agency decision, the Commission could not have made "a clear material error," warranting reconsideration under N.J.A.C. 4A:2-1.6(b)(2). There was nothing for the Commission to "reconsider."

Having reviewed the record, we are satisfied there is no basis to disturb the ALJ's determination based on the substantial credible evidence in the record. S.D. tested positive for cannabis during the Department's random drug test. S.D.'s toxicology expert failed to rebut the validity of the Department's random drug testing process or the NJSTL's positive test result. S.D. presented no

evidence that the positive test result yielded by the NJSTL was inaccurate or flawed.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2884-21