JUSTICE ALBIN delivered the opinion of the Court.
**148 *856 Under N.J.S.A. 52:14B-10(c), when an agency, such as the Civil Service Commission, does not modify or reject the decision of an administrative law judge within a prescribed period, "the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency." This appeal raises the following question: What is the judicial standard of review when the disciplinary decision of the administrative law judge (ALJ) is deemed adopted by the Civil Service Commission (the Commission) because the political branches did not appoint a sufficient number of Commissioners to form a quorum to review the decision?
In this case, the Department of Community Affairs (DCA) terminated from employment Fire Inspector William R. Hendrickson, Jr., for various disciplinary infractions. Hendrickson appealed that decision to the Commission, and the matter was referred to the Office of Administrative Law (OAL) to be heard as a contested case. An ALJ conducted a hearing and sustained the disciplinary charges, but rejected termination as the appropriate discipline and instead imposed a six-month suspension.
**149 The ALJ's decision was then submitted to the Commission. At the time, the political branches had not appointed the requisite number of Commissioners to constitute a quorum. Without a quorum, the Commission could not adopt, reject, or modify the ALJ's decision within the prescribed period, and therefore that decision was "deemed adopted" as the Commission's final decision.
The DCA appealed the discipline imposed by the ALJ. The Appellate Division held that the historical deference due to an agency's decision on appellate review does not apply "when an agency's inability to act on a timely basis is entirely involuntary." In re Hendrickson, 451 N.J.Super. 262, 272, 166 A.3d 269 (App. Div. 2017). The panel concluded that, "at a minimum, an ALJ's deemed-adopted decision should not be reviewed deferentially." Id. at 273, 166 A.3d 269. Nevertheless, the panel afforded deference to the ALJ's factual findings, as it would in the case of a bench trial. Ibid. The panel, however, maintained that no deference would be accorded to the ALJ's legal conclusions -- the discipline imposed. Id. at 273-74, 166 A.3d 269. The panel reviewed the disciplinary sanction de novo, reversed the ALJ's determination, and reinstated the DCA's termination of Hendrickson as the appropriate discipline. Id. at 274-75, 166 A.3d 269.
We now reverse. The ALJ's decision was "deemed adopted" as the final agency determination pursuant to N.J.S.A. 52:14B-10(c). In this unusual setting, the ALJ's decision was deemed adopted because a shorthanded Commission was disabled from acting. Whether we apply the traditional standard of appellate deference to an agency's imposition of discipline or the deferential standard of appellate review to a trial court's sentencing decision, the test remains the same -- was the discipline imposed by the ALJ so disproportionate that it shocks the conscience or one's sense of fairness? See In re Herrmann, 192 N.J. 19, 28-29, 926 A.2d 350 (2007) (appellate *857 review of agency's disciplinary sanction); State v. Roth, 95 N.J. 334, 364-65, 471 A.2d 370 (1984) (appellate review of trial court's sentence). No one disputes that this appeal is from a final agency determination. Because the appellate standard of **150 review is practically identical whether the ALJ's deemed-adopted decision is compared to a trial court's sentencing or an agency's disciplinary determination, in this instance giving the name "agency deference" to the standard is a sensible approach.
In applying a deferential standard, we do not substitute our judgment for that of the ALJ merely because we might have come to a different outcome. So long as reasonable minds might differ about the appropriateness of the disciplinary sanction, we have no charge to second-guess the call made by the ALJ.
Because we do not find that the discipline imposed by the ALJ shocks one's sense of fairness, we vacate the Appellate Division's judgment terminating Hendrickson and reinstate the six-month suspension.
I.
A.
William R. Hendrickson, Jr., began his employment as a fire safety inspector with the DCA in August 2012. While on duty on December 1, 2013, Hendrickson uttered an obscene and belittling remark about a female supervisor overheard by two of his colleagues. The DCA brought three disciplinary charges against Hendrickson: conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6) ; engaging in prohibited gender discrimination, N.J.A.C. 4A:2-2.3(a)(9) ; and violating New Jersey's policy against discrimination in the workplace, N.J.A.C. 4A:2-2.3(a)(12) ("An employee may be subject to discipline for ... [o]ther sufficient cause.").
In September 2014, after a departmental hearing on the disciplinary charges, the DCA issued an order terminating Hendrickson's employment. Hendrickson appealed to the Civil Service Commission, and his matter was transmitted to the OAL for an evidentiary hearing.
**151 At the ALJ hearing, the DCA called five witnesses, two fire safety inspectors with firsthand knowledge of the incident and three other DCA employees with information related to departmental policy and its imposition of discipline. Hendrickson testified on his own behalf. Although the testimony is consistent in many respects, Hendrickson and his colleagues had differing accounts of the words he uttered.
The following narrative is formed from the testimony and evidence presented at the June 2015 ALJ hearing.
B.
On Sunday, December 1, 2013, inspectors from the DCA's Division of Fire Safety were assigned to MetLife Stadium in the Meadowlands, which was hosting a New York Jets football game. The inspectors' task was to ensure that the stadium complied with applicable safety codes. Three of the fire inspectors, Christopher Reier, Vincent Lombardi, and Hendrickson met in the stadium's parking lot before taking on their assignments. Their supervisor was Senior Inspector Margaret Knight, who was not present with the three men at that time.
While in the parking lot, Hendrickson received word that Knight had assigned him to inspect the pyrotechnics display -- the fireworks -- on the roof that day. Reier testified that he relayed the assignment to Hendrickson, who became irate over the posting, and called Knight a "c**t." According to Reier, Hendrickson did not direct the remark to either Reier or Lombardi, *858 but rather made the comment to himself in a voice that was overheard. Lombardi, in his testimony, essentially corroborated this account, although he recalled that Hendrickson referred to Knight as a "f***ing c**t." Both men were offended by Hendrickson's obscene remark and eventually reported the incident.
In his testimony, Hendrickson gave a different account of his reaction to the rooftop pyrotechnic assignment. He stated that Reier informed him of his assignment and then walked away. While four inspectors were fifteen to twenty feet away, he "muttered"
**152 to himself, in a rather loud voice that he attributed to his military background, "I hope she gets a disease." He also admitted that he "said a few words [he's] not proud of," but claimed to have no recollection of using the " 'C' word."
According to a report filed by Knight, after her arrival, Reier informed her of Hendrickson's outburst. Knight announced to a number of the inspectors, including Hendrickson, "that if anyone had any issues with [her], to please respect [her] position and come to [her] and the problem would be discussed and hopefully resolved." After Knight concluded her remarks, Hendrickson walked away without saying a word and did his assigned task without incident.
C.
At the conclusion of the hearing, the ALJ issued a written decision. The ALJ held that Hendrickson uttered a gender slur in a workplace environment and therefore violated the State's policy prohibiting gender discrimination and engaged in conduct unbecoming a public employee. She found that Hendrickson became angry at his supervisor, Senior Inspector Knight, when he received her work order and "in a loud voice [Hendrickson] called [Knight] a 'c**t.' " The ALJ rejected Hendrickson's account as not credible. According to the ALJ, the use of the gender slur was "disrespectful, sexist, discriminatory, unprofessional, in bad taste, improper, and extremely offensive." Such disparaging language, the ALJ noted, has the capacity to undermine workplace morale and, in this case, may have been overheard by members of the public.
Although the ALJ was troubled by Hendrickson's failure to acknowledge his wrongdoing, she reasoned that removal was "too harsh" a punishment given Hendrickson's lack of a disciplinary record in the fifteen months before and nine months after the incident. In determining the appropriate quantum of discipline, the ALJ considered "the nature of the offense, the concept of progressive discipline, and [Hendrickson's] prior work record." With those **153 factors in mind, she concluded that removal from office would be excessive and instead ordered Hendrickson suspended for six months.
D.
The ALJ forwarded the decision to the Civil Service Commission, and both parties filed exceptions. Hendrickson argued that the discipline was too severe, and the DCA argued that termination was the appropriate punishment.
In accordance with N.J.S.A. 52:14B-10(c), the Commission had forty-five days to "adopt, reject or modify" the ALJ's findings and render a final decision. N.J.S.A. 11A:2-3 provides that the Commission "shall consist of five members" and that three members "shall constitute a quorum."[1] The Commission, however, did *859 not have a sufficient number of appointed Commissioners to form a quorum. Without a quorum, the Commission could not operate to adopt, reject, or modify the ALJ's decision. See ibid. For that reason, at the request of the Commission's chairperson, the Chief Administrative Law Judge issued a forty-five-day extension to the Commission "to make a final determination and issue a written opinion."
As that deadline approached, the Commission -- with only one serving member -- still could not form a quorum. Any additional extension of time required "the unanimous agreement of the parties." See N.J.S.A. 52:14B-10(c). Hendrickson rejected the Commission's request for another forty-five-day extension.
Because the Commission did not and could not modify or reject the ALJ's report within the prescribed period, the ALJ's decision was "deemed adopted as the final decision of the head of the agency." See N.J.S.A. 52:14B-10(c) ("Unless the head of the agency modifies or rejects the report within such period, the **154 decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency.").
The DCA appealed the Commission's final agency decision to the Appellate Division. The contested issues concerned the quantum of discipline imposed by the ALJ and the level of deference that should be afforded to an ALJ's deemed-adopted decision by a reviewing court. The Commission took no position on the merits of the appeal.
E.
The Appellate Division reversed the ALJ's decision and reinstated the DCA's termination of Hendrickson's employment. In re Hendrickson, 451 N.J.Super. at 266, 166 A.3d 269. The panel acknowledged that the ALJ's decision "was 'deemed-adopted' as the Commission's final decision" pursuant to N.J.S.A. 52:14B-10(c). Ibid. Nevertheless, the panel held that because the vacancies on the Commission disabled it from forming a quorum and acting, "the deemed-adopted statute does not require traditional deferential appellate review of the ALJ's decision." Ibid. On that basis, the panel applied "the standard of review applicable to bench trials" and vacated the ALJ's six-month suspension. Ibid.
The panel contended that "automatic approval statutes are held in disfavor," and reasoned that given the historical deference "to an agency's expertise on appellate review, some accommodation should be made when an agency's inability to act on a timely basis is entirely involuntary." Id. at 272, 166 A.3d 269. The panel presumed that the Legislature did not intend, in enacting the present version of N.J.S.A. 52:14B-10, to alter the traditional "allocation of [regulatory] responsibilities." Ibid. (alteration in original) (quoting Election Law Enf't Comm'n v. DiVincenzo, 445 N.J.Super. 187, 199, 136 A.3d 963 (App. Div. 2016) ).
In rejecting agency deference as its approach, the panel instead resorted to "the equally familiar standard of review for bench trials." Id. at 273, 166 A.3d 269. In doing so, it stated that it would affirm the ALJ's factual findings "to the extent they are supported **155 by substantial credible evidence in the record," but accord no deference to and review de novo the ALJ's legal conclusions. Ibid. It determined that the ALJ's factfindings were "supported by the record" but that "the propriety of the disciplinary sanction" was "a question of law" subject to de novo review. Id. at 274, 166 A.3d 269. *860 Having accepted that premise, the panel maintained that Hendrickson's "lack of candor and remorse do not inspire confidence in his ability to conduct himself in a measured fashion in an undoubtedly demanding position." Id. at 275, 166 A.3d 269. It added, "[t]his incident, at the very beginning of Hendrickson's career, augured ill for his future." Ibid. The panel concluded, as a matter of law, that "the doctrine of progressive discipline should be bypassed" because "[t]he incident violated the State's anti-discrimination policy and societal norms," thus justifying the reinstatement of Hendrickson's termination. Ibid.
We granted Hendrickson's petition for certification. 231 N.J. 143, 172 A.3d 1082 (2017).
II.
A.
Hendrickson submits that the Appellate Division was "obligated to provide the same degree of deference to [an ALJ's deemed-adopted] decision as it would any other final agency decision," and if the Legislature intended a different standard of review, it would have said so. Hendrickson noted that the Commission was unable to assemble a quorum for at least ten months because the Governor and Legislature had failed to fill vacancies, and therefore the only method for final agency determinations was through the ALJs' deemed-adopted decisions. Hendrickson maintains that the 2014 amendment to N.J.S.A. 52:14B-10 was intended "to eliminate the use of unlimited extensions before an agency issued a final decision" and that the Appellate Division, "without any statutory **156 authority, narrowed the well-settled limited review of a decision by an administrative agency."
Hendrickson contends that his remark, "although objectionable, was not so egregious to warrant removal 'as a matter of law.' " In support of this argument, he points to his otherwise "unblemished record" and to the context of his "objectionable" statement: it "was not directed to anyone"; "Knight was not in the vicinity when the statement was made"; and that as a subordinate, he had "no power relationship over" Knight. He also states that "he clearly 'learned his lesson' " and "gets it" and that the Appellate Division disregarded the mitigating factors. He therefore seeks reinstatement of his six-month suspension.
B.
The DCA does not dispute that "the ALJ's decision in effect becomes the agency's decision" under the deemed-adopted provision of N.J.S.A. 52:14B-10(c) ; rather, it contends that the ALJ's decision is not entitled to agency deference because the Commission, due to vacancies, was unable to muster a quorum and apply "its technical and legal expertise" in reviewing the ALJ's findings. The DCA maintains that deference is afforded to an administrative agency because of its "special 'expertise and superior knowledge of a particular field,' " quoting In re Stallworth, 208 N.J. 182, 195, 26 A.3d 1059 (2011). That, according to the DCA, contrasts with the determination of an ALJ, who "is not considered a subject matter expert."
The DCA contends that the Appellate Division, in conducting its de novo review of the discipline imposed by the ALJ, correctly concluded that "[t]ermination was the only appropriate sanction for Hendrickson's gross unbecoming conduct and serious violation of the State's zero tolerance policy against gender based discrimination and harassment." The DCA concurs with the panel's rejection of "progressive *861 discipline" in favor of termination because Hendrickson's gender slur toward a supervisor occurred in a **157 public place and because Hendrickson's duties involved public safety and interaction with the public.
III.
A.
The sole legal issue before this Court is the appropriate level of deference to be afforded to an ALJ's disciplinary decision that becomes a final agency determination through the deemed-adopted provision of N.J.S.A. 52:14B-10(c). That issue, of course, must be viewed in light of the fact that the Civil Service Commission was unable to form a quorum and function due to the failure of the political branches to fill vacancies in the Commission's membership.
The standard of review of an ALJ's deemed-adopted decision is a question of law, and therefore we owe no deference to the legal conclusions of the Appellate Division. Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 253, 71 A.3d 888 (2013). Accordingly, our charge is to review this matter de novo. Ibid.
B.
We begin with the statute that is at the heart of the controversy. N.J.S.A. 52:14B-10 generally sets forth the procedures for resolving contested agency cases submitted to the Office of Administrative Law. Subsection (c) -- the "deemed-adopted" portion of the statute -- provides:
The head of the agency, upon a review of the record submitted by the administrative law judge, shall adopt, reject or modify the recommended report and decision no later than 45 days after receipt of such recommendations.... Unless the head of the agency modifies or rejects the report within such period, the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency. The recommended report and decision shall be a part of the record in the case. For good cause shown, upon certification by the director and the agency head, the time limits established herein may be subject to a single extension of not more than 45 days. Any additional extension of time shall be subject to, and contingent upon, the unanimous agreement of the parties.
**158 [ N.J.S.A. 52:14B-10(c) (emphasis added).]
The current version of subsection (c) is the product of a 2014 amendment. L. 2013, c. 236, § 2. The Legislature amended subsection (c) of N.J.S.A. 52:14B-10 to set a strict deadline for administrative agencies to "adopt, reject or modify" an ALJ's decision -- unless all the parties agreed to an extension. Ibid. Under the amendment, when the agency does not act within the forty-five-day statutory timeframe -- or within the single extension period not to exceed forty-five days -- the ALJ's decision is "deemed adopted as the final decision of the head of the agency." Ibid. In this way, the Legislature ensured that there would always be a timely final agency decision.
Construing the pre-2014 version of N.J.S.A. 52:14B-10(c), this Court in King v. Racing Commission declined to strictly enforce the forty-five-day time limit to the deemed-adopted provision because there was no showing in that case that the agency's delay to act was in "bad faith," "inexcusable negligence," "gross indifference," or complete inaction. 103 N.J. 412, 421, 511 A.2d 615 (1986). In a belated but apparent response to King, the Legislature amended N.J.S.A. 52:14B-10(c) and "eliminate[d] any consideration of whether the failure to *862 act within the prescribed time period is due to circumstances beyond the agency's control." DiVincenzo, 445 N.J.Super. at 199, 136 A.3d 963 ; accord Sponsor's Statement to A. 1521 (L. 2013, c. 236, § 2) ("[A]mendment would eliminate the provision authorizing the unlimited extension of this 45-day time period, and provide, instead, for a single extension of no more than 45 days for good cause shown, and upon certification by the director and agency head.").
The DCA does not contest that the ALJ's decision is a final agency determination pursuant to N.J.S.A. 52:14B-10(c). It only claims that an appellate court should afford the ALJ's decision less deference than an actual agency determination. Here, specifically, we review a challenge to the discipline imposed on a state employee by an ALJ, whose decision has become a final agency determination. Traditionally, we give substantial deference **159 to an agency's imposition of a disciplinary sanction, based on its "expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. at 28, 926 A.2d 350. "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test ... is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.' " Id. at 28-29, 926 A.2d 350 (alteration in original) (quoting In re Polk, 90 N.J. 550, 578, 449 A.2d 7 (1982) ). That standard gives the agency a wide berth of discretion. Our task is not to substitute our judgment for that of the agency, but rather to stay our hand even if we would have reached a different result. Ibid. Only a patently unreasonable sanction would call for this Court's intervention.
In the present case, the Appellate Division held that a different standard of review should apply to an ALJ's disciplinary decision that becomes a final agency determination because the Commission was unable to form a quorum to act. The panel opted to apply the standard of review for bench trials and declared that it would defer to the ALJ's factfindings, but not to the ALJ's conclusions of law. The panel, however, failed to draw the parallel between an ALJ's imposition of discipline and a trial court's imposition of sentence. The panel overlooked the full scope of deference afforded to a trial judge who imposes sentence after a bench trial or jury trial.
The panel evidently classified the ALJ's disciplinary sanction as a legal conclusion and therefore erroneously engaged in a de novo review. An abuse of discretion standard, however, applies to the judicial imposition of a sentence, Roth, 95 N.J. at 364-65, 471 A.2d 370, or a disciplinary sanction, In re Herrmann, 192 N.J. at 28-29, 926 A.2d 350. Appellate deference extends to a trial judge's imposition of a sentence, whether the judge or a jury sits as the trier of fact. We have made clear that we will not exercise our judicial power to modify a sentence unless "the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience." Roth, 95 N.J. at 364, 471 A.2d 370. In **160 Roth, we indicated that we did not "anticipate that we [would] be required to invoke this judicial power frequently." Ibid.
We do not see any material difference between the appellate standard of review of an agency's disciplinary sanction and a trial judge's imposition of a sentence. In both instances, we afford a high degree of deference. Indeed, in fashioning an appellate standard of review for sentencing, we relied in part on the appellate standard of review of administrative agency determinations, particularly in Civil Service Commission cases. Id. at 364, 471 A.2d 370. In *863 Roth, for sentencing review purposes, we cited to and quoted from Campbell v. Department of Civil Service, 39 N.J. 556, 562, 189 A.2d 712 (1963), a case involving a Civil Service Commission decision, stating: "[W]e will not upset a determination ... in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the civil service act." Roth, 95 N.J. at 364, 471 A.2d 370 (alterations in original).
The appellate tests for reviewing an administrative disciplinary sanction and a criminal sentence are virtually the same. Therefore, the Appellate Division erred in suggesting that appellate review of a disciplinary sanction imposed by a judge is de novo and different from traditional appellate review of an agency determination. Additionally, merely because the factual findings and rulings made by ALJs are oftentimes contingent on whether an agency accepts, rejects, or modifies an ALJ's decision does not mean that ALJs are second-tier players or hold an inferior status as factfinders.
IV.
The standard of review would be no different if we afford an ALJ the same level of deference that a trial judge enjoys when imposing a sentence -- to which a disciplinary sanction is comparable. Accordingly, we will apply the standard of review for disciplinary sanctions set forth in In re Herrmann, and assess whether the sanction imposed by the ALJ here "is so disproportionate to the **161 offense, in light of all the circumstances, as to be shocking to one's sense of fairness." 192 N.J. at 28-29, 926 A.2d 350 (quoting In re Polk, 90 N.J. at 578, 449 A.2d 7 ).[2]
Given that deferential standard of review, the ALJ's six-month suspension must be sustained. The issue is not whether we would have imposed different discipline if we were the decisionmakers in the first instance, but whether the ALJ's disciplinary sanction is "shocking to one's sense of fairness." See ibid. Reasonable people may have differing opinions regarding the appropriate quantum of discipline in this case. However, so long as the discipline here falls within a continuum of reasonable outcomes, we must defer, for we have no charge to substitute our judgment for that of the statutorily authorized decisionmaker.
Hendrickson's use of a highly offensive gender slur in a public place and overheard by co-workers must be firmly condemned, even if Hendrickson was just "muttering" to himself in a loud voice about his female supervisor. A belittling gender insult uttered in the workplace by a state employee is a violation of New Jersey's policy against discrimination and Hendrickson's conduct was unbecoming a public employee. That Hendrickson engaged in disrespectful, sexist, and unprofessional conduct -- as the ALJ found -- is beyond question. The ALJ rebuked Hendrickson's language in the strongest terms in sustaining the charges against him. Without an appropriate penalty, such an insult would have a corrosive effect on morale in the workforce.
Nevertheless, in setting the appropriate discipline, the ALJ found that Hendrickson's *864 behavior amounted to an isolated incident. Hendrickson had an otherwise unblemished disciplinary record during the fifteen months before and nine months following **162 the incident. She determined that those mitigating factors warranted a lesser penalty -- a six-month suspension -- rather than the extreme sanction of termination. Ultimately, she found that Hendrickson was redeemable.
Based on our deferential standard of review, we cannot conclude that the ALJ's decision is shocking to one's sense of fairness.
V.
For the reasons expressed, we reverse the judgment of the Appellate Division and reinstate the ALJ's determination suspending Hendrickson for a period of six months from his position as fire safety inspector.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.

The members of the Civil Service Commission are "appointed by the Governor with the advice and consent of the Senate." N.J.S.A. 11A:2-3.

Our holding is limited to the issue before us -- the appellate standard of review of an ALJ's imposition of a disciplinary sanction in the circumstances presented here, where the ALJ's decision becomes the final agency determination. We do not address the standard of review that applies when an agency is shorthanded and disabled from action on issues other than disciplinary sanctions.