**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3160-21

IN THE MATTER OF
CHRISTOPHER FERRO,
BERGEN COUNTY
SHERIFF'S OFFICE.

_____

Argued June 4, 2024 – Decided July 8, 2024

Before Judges Natali and Puglisi.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2022-3298, 2023-61 and 2023-768.

Brian M. Hak argued the cause for appellant/cross-respondent Bergen County Sheriff's Office (Eric M. Bernstein & Associates, LLC, attorneys; Eric M. Bernstein, of counsel and on the briefs; Brian M. Hak, on the briefs).

David J. Altieri argued the cause for respondent/cross-appellant Christopher Ferro (Galantucci & Patuto, attorneys; David J. Altieri, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Brian D. Ragunan, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

The Bergen County Sheriff's Office (BCSO) challenges the Civil Service Commission's (Commission) November 9, 2021 decision reinstating Correctional Officer Christopher Ferro, its May 23, 2022 decision awarding him back pay and benefits, and its November 2, 2022 decision declining to reconsider its back pay award. Officer Ferro also cross-appeals from the November 2, 2022 decision.

We conclude the Commission's decisions with respect to Officer Ferro's reinstatement and back pay were supported by the record and not arbitrary, capricious, or unreasonable, and accordingly affirm. Because the Commission did not determine the extent of Officer Ferro's entitlement to other benefits, however, we remand for the Commission to issue a decision as to those benefits only.

I.

We begin by recounting the pertinent facts in the record. Officer Ferro was employed by BCSO as a correctional officer beginning in April 2005. On November 7, 2018, BCSO conducted a random drug screening of its staff pursuant to its policies and those of the Attorney General. See Att'y Gen.'s Law Enf't Drug Testing Policy (rev. 2018) (AG Policy). Those policies required

random drug testing of at least ten percent of a law enforcement agency's sworn officers once during 2018 and twice in subsequent years. Id. at 3 § II(C)(1). In the event of a positive test, the AG Policy required the agency to immediately suspend and ultimately terminate the officer. Id. at 12 § VIII(C). Further, the AG Policy provided any officer who tested positive for illegal drugs "shall be permanently barred from future law enforcement employment in New Jersey." Ibid.

Officer Ferro was selected for random testing and provided two urine samples, one of which was tested by the New Jersey State Toxicology Laboratory (the State Lab). For reasons unexplained in the record, Officer Ferro's second sample was never tested.

BCSO received the December 28, 2018 results from the screening, which showed Officer Ferro tested positive for 11-carboxy-tetrahydrocannabinol (THC), a metabolite of cannabis, at 18.94 nanograms per milliliter (ng/ml), beyond the 15 ng/ml threshold for a positive test.[1] The State Lab's report

---

[1] In the Summary of Test Results produced by the State Lab, the concentration of Officer Ferro's sample showed 2.8 ng/ml was crossed out, initialed, and replaced with 18.94 ng/ml.

indicated Officer Ferro claimed to have used cannabidiol (CBD)[2] oil, but that use "should not be expected to produce a positive result for THC."[3] At that time, the State Lab lacked the capacity to test for CBD.

BCSO suspended Officer Ferro on January 7, 2019 and issued a Preliminary Notification of Disciplinary Action on January 11, 2019, which charged him with neglect of duty, a performance of duty violation, conduct unbecoming a public employee, inability to perform duties, and other sufficient cause based on his violation of various departmental rules and regulations. It subsequently issued a Final Notice of Disciplinary Action which terminated Officer Ferro effective January 11, 2019. Officer Ferro filed his appeal with the Commission on August 30, 2019.

In approximately February 2020, the State Lab acquired technology to test for CBD, and based on Officer Ferro's claimed use of CBD, retested his sample on February 6, 2020. Neither party requested the re-test. The results revealed

---

[2] CBD is also derived from cannabis but is not a controlled substance. See N.J.S.A. 4:28-8.

[3] The AG Policy required the medical review officer assigned to the State Lab review the test results and medication information form submitted by the examinee to "seek to determine whether any of the substances listed on the form would explain the positive test result" and "issue a report indicating whether or not the sample tested positive due to a listed medication." AG Policy at 11 § VI(D).

no CBD detected above the cutoff level of 5 ng/ml, however, THC was detected at 10.2 ng/ml, below the positive threshold.

Various witnesses testified, including Dr. George Jackson and Dr. Andrew Falzon from the State Lab, at a hearing before the Office of Administrative Law (OAL).[4] Due to a technical error, the hearing was not recorded and no transcript exists. Upon discovery of this error, the parties were given the option of re-trying the case or stipulating to "a statement of facts in lieu of a recorded record, from which [the Administrative Law Judge (ALJ)] would decide the case." The parties chose the latter option and each submitted a statement of facts. The ALJ found "the parties agreed to the most important facts and their points of disagreement are minor in nature and do not substantially affect factual issues that would be critical to the outcome of the matter."

The ALJ issued a decision reversing Officer Ferro's removal on May 21, 2021, in which he found the two tests taken together, one showing a THC result above the positivity threshold and one below it, presented equivocal evidence which could not support a finding BCSO met its burden of proving the charges against Officer Ferro. The ALJ concluded proper testing procedures were

---

[4] Dr. Gary Lage also testified as an expert on behalf of Officer Ferro. The parties agree his testimony was inconsequential to the issue before us and we accordingly do not detail that portion of the record.

followed for both tests, and explained it was "plausible that all or most chemical samples will degrade with the passage of time," but there was no evidence of actual degradation. Even if there was, he stressed, the experts could not state to a reasonable degree of scientific certainty whether that degradation would result in a higher, lower, or the same concentration of THC in the second test.

In his written opinion, the ALJ detailed the testimony of Dr. Jackson and Dr. Falzon. According to the ALJ, Dr. Jackson testified Officer Ferro's sample could have degraded, but he could not confirm actual degradation occurred, nor "whether degradation would result in a higher, or in a lower, or in the same finding for THC" as compared to the December 2018 test. The ALJ also stated Dr. Falzon agreed the sample could have degraded, but "could not say if the numbers for the concentration of the chemicals would go up, would go down, or would stay the same."

BCSO filed exceptions with the Commission regarding purported inaccuracies in the ALJ's recollection of Dr. Jackson's and Dr. Falzon's testimony. In support, it submitted certifications of both doctors regarding their testimony: Dr. Falzon certified he had testified "the level of THC in stored samples would be expected to go down over time and that it would be highly unlikely to go up," and Dr. Jackson similarly denied testifying "degradation

would result in higher results" and, significantly, also certified he testified "the degradation in [Officer] Ferro's urine would result in a lower or in the same finding for THC when it was re-tested for CBD." The Commission remanded the case to the OAL for further fact-finding with respect to the disputed expert testimony regarding the difference between the December 2018 and February 2020 test results, explaining it was "not comfortable allowing mere 'memory' or 'notes' to be relied upon to determine whether [Officer Ferro] is guilty."

The ALJ issued a second decision again recommending Officer Ferro be reinstated on September 15, 2021. The ALJ declined to take further testimony from the experts or other witnesses, finding his notes were accurate, his memory was reliable, and both supported his original decision. He reiterated neither Dr. Jackson nor Dr. Falzon "stated with certainty that [Officer] Ferro's sample actually degraded," and even if it had, "no one would know the extent to which it degraded and whether the concentration of the sample had changed." The ALJ found "while both Dr. Jackson and Dr. Falzon assumed that the samples . . . degraded over time, they did not say that the concentration of THC in the sample could only go down [but rather] [t]hey both testified that the concentration of THC in the sample could also remain the same."

The ALJ disagreed with Dr. Falzon's recollection of his testimony set forth in his certification, finding he was "fully confident that at the hearing he, like Dr. Jackson, testified that the concentration of a sample could become less or could remain the same." He noted "Dr. Falzon's certification mentions nothing about whether a sample's concentration can remain the same over a given period of time." Additionally, the ALJ found Dr. Falzon's certification indicated it was "highly unlikely," but not impossible, that the concentration could increase, "impl[ying] that the concentration can also remain the same over time."

Although acknowledging the dispute presented by Dr. Jackson's certification, the ALJ found it "academic." The ALJ explained "if Dr. Jackson had testified that the concentration of chemicals in the urine sample could only have gone down" over time, "the lower reading of 10.2 ng/ml would likely be attributable to 'downwards' degradation of the sample . . . and there would be no basis to conclude that the two test results were equivocal." Because Dr. Jackson testified "the concentration could remain the same even after the passage of fourteen months," however, the ALJ concluded he was left "in [l]imbo (i.e., unable to logically determine for certain) whether to accept the one test result or the other test result as the accurate result." He further reasoned "if the concentration of the sample had 'remained the same,' then the result of the

8

February 6, 2020 test rendered an accurate result of 10.2 ng/[m]l, which contrasts with the December[] 2018 test results and necessarily casts doubt upon the earlier results."

The ALJ found neither expert testified the February 2020 test was "inaccurate, or in an[y] way invalid because of the age of the specimen," or that either test suffered mistakes that would result in incorrect THC levels. Thus, the ALJ concluded both tests should be considered "equally accurate," and "[w]hen the two test results stand side-by-side, it becomes impossible to know which of the two tests rendered the correct result because we do not know if the sample became less concentrated over time or remained the same over time or even became more concentrated over time." This led the ALJ to the "inevitable conclusion" that the evidence was equivocal, and BCSO failed to meet its burden.

Both parties filed exceptions, which were reviewed at the Commission's October 27, 2021 meeting. Upon a motion to uphold Officer Ferro's initial removal, the vote was tied, with two members in favor and two against, resulting in the adoption of the ALJ decision ordering Officer Ferro's reinstatement by

default pursuant to N.J.S.A. 52:14B-10(c).[5] The decision was memorialized in a November 9, 2021 letter informing the parties Officer Ferro had been reinstated and was entitled to back pay, benefits, seniority, and counsel fees. He returned to work at BCSO on December 1, 2021.

BCSO filed its first notice of appeal on December 5, 2021, which we sua sponte dismissed as interlocutory due to outstanding back pay issues before the Commission. In re Ferro, No. A-1016-21 (App. Div. Feb. 22, 2022). Subsequently, in a May 23, 2022 order, the Commission found Officer Ferro was entitled to counsel fees and back pay for certain periods of 2019 and 2021 only, less income and unemployment benefits received during those periods.

Specifically, it awarded back pay for the three months Officer Ferro was employed as an Uber driver and freelance writer in 2019, and the month between the Commission's adoption of the ALJ decision and Officer Ferro's reinstatement in 2021, as required by N.J.A.C. 4A:2-2.1(d)(5). The Commission found Officer Ferro was not entitled to back pay for 2020 and the remainder of 2021 because he failed to mitigate his damages contrary to N.J.A.C. 4A:2-2.10(d)(4). It explained Officer Ferro was unemployed during those time periods and applied

---

[5] N.J.S.A. 52:14B-10(c) provides "the decision of the [ALJ] shall be deemed adopted as the final decision of the head of the agency" unless the agency head "modifies or rejects" the decision within forty-five days of its receipt.

for only three jobs over six days in August 2021. The Commission rejected his arguments that he was not required to seek employment as the COVID-19 pandemic limited his opportunities, he was caring for his young children, and he could no longer work in law enforcement, the only field in which he had experience, finding all of them unsupported by applicable law.

It also rejected BCSO's contention that Officer Ferro should receive back pay for only the period after the February 2020 test, noting the situation was similar to one in which an employee was suspended due to criminal charges which are later dismissed. Although the employer may have been justified in removing the employee while the charges were pending, the Commission explained, the employee would still be entitled to back pay for the entire period.

The Commission concluded Officer Ferro "could have searched for employment and he could have sought work from employers that were hiring during the pandemic like Amazon, supermarkets, restaurants offering take-out and delivery, work-at-home jobs, physical labor, and/or other employment." Further, it added no law "authorizes one to stay at home to care for children during the mitigation period because one feels that it is more cost effective." The Commission did not specify the extent of Officer Ferro's entitlement to

11

benefits such as vacation leave, sick leave, or reimbursement for health insurance premiums.

BCSO filed a new Notice of Appeal on June 15, 2022. Officer Ferro sought, and we granted, a temporary remand under Rule 2:9-1(b) to allow the Commission to decide his then-pending application for reconsideration of its back pay decision. The Commission declined to reconsider in a November 2, 2022 order, again concluding Officer Ferro failed to sufficiently mitigate his lost wages. BCSO amended its notice of appeal to include that order and Officer Ferro filed a notice of cross-appeal.

## II.

We begin by discussing the standard governing our review, which the parties dispute. BCSO argues the orders on appeal are not entitled to the deference typically afforded agency decisions and instead should be reviewed de novo, because the Commission upheld the ALJ's decision only by default. Officer Ferro responds the facts of this case present no basis for any lesser standard, and BCSO's position is unsupported by any authority.

Generally, the limited nature of our review of administrative agency action is well-settled. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Indeed, we defer to administrative agencies in recognition

12

of their "expertise and superior knowledge of a particular field," In re Herrmann, 192 N.J. 19, 28 (2007), and presume the validity of an "administrative agency's exercise of its statutorily delegated responsibilities," Lavezzi v. State, 219 N.J. 163, 171 (2014).

For those reasons, we ordinarily decline to disturb an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Seago v. Bd. of Trs., Tchrs' Pension & Annuity Fund, 257 N.J. 381, 391 (2024) (quoting Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018)). We may not substitute our judgment for that of the administrative agency, even if we may have reached a different result. Allstars Auto Grp., 234 N.J. at 158 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).

Our Supreme Court has considered the appropriate standard of review to be applied when the Commission's disciplinary decision was deemed adopted by default under N.J.S.A. 52:14B-10(c) because it lacked sufficient members to constitute a quorum. In re Hendrickson, 235 N.J. 145, 148 (2018). In that case, the Court rejected our application of a de novo standard and instead concluded a decision deemed adopted by the Commission's inability to act pursuant to

N.J.S.A. 52:14B-10(c) was entitled to the deference typically afforded agency decisions. Id. at 160.

With this guidance in mind, we see no reason to depart from the well-established deferential standard generally applied to our review of agency decisions. BCSO has identified no authority in support of its position that we should apply a more stringent standard. Further, although arising in slightly different circumstances, Hendrickson makes clear an agency decision is entitled to deference even if adopted by default. Ibid. That the Commission members disagreed and two expressed doubt about the ALJ's decision here does not mean the final outcome is subject to a different review than any other decision.

Even accepting BCSO's contention and reviewing the decisions de novo, however, we are satisfied we would reach the same outcome. Under that standard, the ALJ's and Commission's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). As detailed infra, the facts before us, the ALJ, and the Commission fully support the decisions as to Officer Ferro's reinstatement and back pay award.

III.

BCSO argues the ALJ and thus the Commission erred in finding the two drug test results presented equivocal evidence and it therefore failed to meet its burden of proof to justify Officer Ferro's removal. Specifically, it contends "the evidence unequivocally demonstrated that [Officer] Ferro's system contained a THC level that was above the permissible cutoff," requiring his termination under the AG Policy. It maintains the ALJ found the December 2018 test followed proper testing procedure, and "this test result alone would have required [Officer] Ferro's removal." In the alternative, it asks we remand to a different ALJ "for limited testimony on the degradation issue."

BCSO stresses Dr. Jackson and Dr. Falzon each testified and certified, contrary to the ALJ's conclusion, the degradation of Officer Ferro's sample would not have produced an increased concentration of THC. It notes, without reference to any expert testimony, it was "certain" and "a matter of common sense" that the THC concentration in the sample would have degraded between the two tests, explaining the reduced THC level in the February 2020 test.

Further, BCSO argues, as Dr. Jackson testified, the February 2020 test was "only a qualitative review that was performed solely for the purpose of determining whether CBD existed in [Officer] Ferro's system or not and was not

performed to determine the precise level of CBD, or THC." For the reasons that follow, we disagree with each of these points.

The rights and duties of government employees are governed by the Civil Service Act, which permits major discipline of a public employee, including removal, for various employment-related offenses. N.J.S.A. 11A:1-1 to -2-6; N.J.A.C. 4A:2-2.3. Public employees may appeal certain disciplinary actions taken by their employer to the Commission pursuant to N.J.S.A. 11A:2-15. In such an appeal regarding major disciplinary action, the employer bears the burden of proving the essential facts of the offense justifying the discipline by a preponderance of the evidence. N.J.S.A. 11A:2-21; N.J.A.C. 4A:2-1.4(a); Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006) (recognizing preponderance of the evidence is "the usual burden of proof for establishing claims before state agencies in contested administrative adjudications" (quoting In re Polk, 90 N.J. 550, 560 (1982))).

We are satisfied the ALJ's decision was fully supported by the record and not arbitrary, capricious, or unreasonable. In isolation, the December 2018 positive test may have supported removal, but those are simply not the facts before us.

16 <span>A-3160-21</span>

As the ALJ noted, neither Dr. Jackson nor Dr. Falzon testified to a reasonable degree of scientific certainty that Officer Ferro's sample actually degraded between the December 2018 and February 2020 tests. Even assuming it had, neither testified to a reasonable degree of scientific certainty the degradation caused a decreased concentration of THC, or the extent of degradation. This equivocal testimony about what could have happened fails to adequately explain the discrepancy between the test results. Thus, contrary to BCSO's contention, whether the change in THC concentration between the two tests was due to degradation of the sample over time is far from "certain" or "a matter of common sense." Indeed, those characterizations in its merits brief were unsupported by the expert testimony.

Whether the THC concentration of Officer Ferro's sample could have increased over time is, in our view, irrelevant. The record makes clear the concentration did not increase, and neither party argues that it did. Its only potential relevance would be to call into question the ALJ's recollection of the remainder of the testimony. Even assuming the ALJ's memory and notes regarding the testimony were incorrect, and the experts did not testify the concentration could increase, that was not the basis for the ALJ's opinion.

Setting aside the disputed testimony regarding an increase in concentration, as the ALJ explained, "[w]hen the two test results stand side-by-side, it becomes impossible to know which of the two tests rendered the correct result because we do not know if the sample became less concentrated over time or remained the same over time." Neither party disputes Dr. Jackson testified the concentration could have remained the same. As the ALJ reasoned, "if the concentration of the sample had 'remained the same,' then the result of the February 6, 2020 test rendered an accurate result of 10.2 ng/[m]l, which contrasts with the December[] 2018 test results and necessarily casts doubt upon the earlier results." Neither Dr. Jackson nor Dr. Falzon testified that either test suffered procedural errors or "that the February 6, 2020 test was inaccurate, or in an[y] way invalid because of the age of the specimen."

We acknowledge the discrepancy presented by Dr. Falzon's certification and the ALJ's findings. As noted, however, the ALJ expressly rejected Dr. Falzon's recollection, and further explained why Dr. Falzon's statement the concentration would be "highly unlikely" to increase, but an increase would not be impossible, supported an inference that the concentration could also remain the same. The Commission considered both the ALJ's findings and the certification before ultimately reaching a tie vote and adopting the ALJ's

18

decision. If it had been persuaded by Dr. Falzon's certification, it could have rejected the decision. Even assuming the ALJ inaccurately described Dr. Falzon's testimony, at best this results in BCSO's two experts providing divergent opinions about whether the concentration could have remained the same over time, neither to a reasonable degree of scientific certainty.

Further, regardless of the reason for the February 2020 re-test, its results revealed a numerical THC level below the positivity cut-off. BCSO's characterization of the test as "qualitative" and performed solely to determine whether CBD was present is inconsistent with the quantitative THC result received.

At bottom, the evidence and expert testimony simply does not establish the February 2020 test showed a lower concentration of THC because of degradation over time. The two tests, each of which was accurate and performed in accordance with State Lab procedure, stand in equipoise, one above the positivity threshold and one below. Against this record, we are satisfied the ALJ's determination that BCSO failed to establish by a preponderance of the evidence that Officer Ferro engaged in misconduct justifying his removal was supported by the record and not arbitrary, capricious, or unreasonable.

IV.

BCSO reprises its argument the Commission erred in awarding Officer

Ferro back pay,[6] contending it should have limited back pay to the period after

the February 2020 test because no basis to reinstate existed until that test. BCSO

also maintains the Commission properly found Officer Ferro failed to mitigate

despite suitable substitute employment which he could have obtained through a

diligent search. In opposition to Officer Ferro's cross-appeal, it relies upon

O'Lone v. Department of Human Services, 357 N.J. Super. 170, 182 (App. Div.

2003), for the proposition that the lower sights doctrine, requiring an employee

to "lower their sights" with respect to obtaining other employment in mitigation

after an inability to secure a comparable position, is applied "more expansively"

in Commission matters than other contexts.

Officer Ferro responds the Commission erred in limiting his back pay,

maintaining the pandemic and circumstances of his removal constrained his

ability to work in his only area of experience, law enforcement. Relying upon

several unpublished cases, he argues third-party employment is not "the only

acceptable manner" of mitigation and the Commission must consider his family

---

[6] BCSO does not dispute Officer Ferro's entitlement to back pay for the four weeks between the Commission decision and his reinstatement.

situation in its analysis of the totality of circumstances. Officer Ferro also contends under N.J.A.C. 4A:2-2.10, the only permissible limitations on back pay are for failing to make reasonable efforts to seek employment or causing unreasonable delay, not the later discovery of evidence supporting his reinstatement.

N.J.A.C. 4A:2-2.10(d) permits an award of back pay to a reinstated public employee, which encompasses "regular wages" and benefits including "vacation and sick leave credits and additional amounts expended by the employee to maintain his or her health insurance coverage," which would have been earned during a period of removal determined to have been improper. "Unless otherwise ordered," the award "shall be calculated from the effective date of the [employer]'s improper action to the date of the employee's actual reinstatement to the payroll." N.J.A.C. 4A:2-2.10(e).

No award is permitted, however, for any period during the removal in which "the employee has been unemployed or underemployed," and "failed to make reasonable efforts to find suitable employment." N.J.A.C. 4A:2-2.10(d)(4). Suitable employment means "employment that is comparable to the employee's permanent career service position with respect to job duties, responsibilities, functions, location, and salary." N.J.A.C. 4A:2-2.10(d)(4)(iii).

21

Under the lower sights doctrine, where the employee has been unable to secure comparable employment "after a reasonable amount of time," locating suitable employment may require "expanding the type of service sought, provided he [or she] is suited, or . . . reducing the salary demanded, or . . . enlarging the geographical area in which the individual should accept employment." Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 40 (1981); see also O'Lone, 357 N.J. Super. at 182 (finding lower sights doctrine should be applied "more expansively" in Civil Service discipline cases than cases involving a violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -50).

The employer carries the initial burden of establishing the employee did not make "reasonable efforts to find suitable employment," which it may meet by "presenting evidence that the employee failed to seek any substitute employment or, alternatively, that suitable substitute employment was available that the employee did not obtain." O'Lone, 357 N.J. Super. at 181; see also N.J.A.C. 4A:2-2.10(d)(4)(v) (providing "[t]he burden of proof shall be on the employer to establish that the employee has not made reasonable efforts to find suitable employment"). Once the employer has made either of these showings, "the burden then shifts to the employee to present evidence that suitable substitute employment was unavailable or that the employee was unable to

obtain such employment despite diligent efforts." Ibid. The Commission then must determine "whether there was suitable substitute employment the employee could have obtained had he or she made a diligent search." Ibid.

The determination of whether an employee made reasonable efforts is

> based upon the totality of the circumstances, including, but not limited to, the nature of the disciplinary action taken against the employee; the nature of the employee's public employment; the employee's skills, education, and experience; the job market; the existence of advertised, suitable employment opportunities; the manner in which the type of employment involved is commonly sought; and any other circumstances deemed relevant based upon the particular facts of the matter.
>
> [N.J.A.C. 4A:2-2.10(d)(4)(iv).]

The code further provides reasonable efforts "include, but [are] not . . . limited to, reviewing classified advertisements in newspapers or trade publications; reviewing Internet . . . job listings or services; applying for suitable positions; attending job fairs; visiting employment agencies; networking with other people; and distributing resumes." N.J.A.C. 4A:2-2.10(d)(4)(ii). Additionally, regardless of mitigation efforts, any back pay award "shall be reduced by the amount of money that was actually earned during the period of separation, including any unemployment insurance benefits received." N.J.A.C. 4A:2-2.10(d)(3).

23

Again, we are satisfied the Commission's decision was supported by the record and not arbitrary, capricious, or unreasonable. Nothing in the record demonstrates Officer Ferro made reasonable efforts to find suitable employment in 2020 and 2021. Indeed, Officer Ferro does not dispute that he did not attempt to secure employment at all during those years except for applying for three jobs in August 2021. As the Commission noted, although Officer Ferro could not obtain employment in law enforcement due to the nature of his removal, and the COVID-19 pandemic certainly affected the job market, there were employment opportunities available which Officer Ferro could have obtained, such as "Amazon, supermarkets, restaurants offering take-out and delivery, work-at-home jobs, [or] physical labor."

Officer Ferro provides no binding authority to support his position that as a matter of law, staying home to care for his children is sufficient mitigation.[7] On the record before us, Officer Ferro's affidavit of mitigation submitted to the Commission was not included. He appears to contend, however, that caring for his children rather than seeking employment "was a necessity" because he was unable to obtain employment at a wage supporting childcare costs due to

---

[7] We note the unpublished cases Officer Ferro relies upon are not only non-precedential, see R. 1:36-3, they are factually distinguishable.

A-3160-21

economic circumstances attendant to the COVID-19 pandemic and his lack of work experience outside of law enforcement. While we certainly do not diminish the value and importance of childcare, the record on this point is simply insufficient for us to conclude that the Commission's decision to deny a back pay award was arbitrary, capricious, or unreasonable.

Similarly, BCSO presents no authority for its position that Officer Ferro's back pay award should be limited to the period following the February 2020 test. Nothing in N.J.A.C. 4A:2-2.10 indicates such a limitation is permissible. Even assuming the law permitted the limitation BCSO suggests, it would not make sense to do so because, as noted, it is unclear which of the two drug tests reflected the correct THC level.

Finally, Officer Ferro maintains he was entitled to the full amount of benefits, including vacation, sick leave, and health insurance reimbursement, for the period of his removal, as he contends "mitigation does not apply to benefits" and BCSO's position to the contrary contradicts N.J.A.C. 4A:2-2.10. BCSO responds due to his failure to mitigate, Officer Ferro is entitled to health insurance reimbursement and sick leave accruing during the periods he was awarded back pay only. It also maintains Officer Ferro was not entitled to any vacation leave that would have accrued in 2019 or 2020, because it can be

25

carried over only one year under N.J.S.A. 11A:6-3(e) and N.J.A.C. 4A:6-1.2(g) and thus would have expired before the Commission's 2022 decision.

As noted, an employee is entitled not only to wages that would have been earned during the period of improper separation, but also to "vacation and sick leave credits and additional amounts expended by the employee to maintain his or her health insurance coverage." N.J.A.C. 4A:2-2.10(d). "Insofar as is possible, a fully vindicated employee must be made whole" through an award of "all that [they] would have been clearly entitled to had the [employer] not wrongfully discharged [them]." Eaddy v. Dep't of Transp., 208 N.J. Super. 156, 162 (App. Div. 1986). "[V]acation leave and sick leave are no less 'compensation for services rendered,' James v. N.J. State Prison, 176 N.J. Super. 207, 209 (App. Div. 1980), than are back wages." Eaddy, 208 N.J. Super. at 162 (citation reformatted).

Although the Commission awarded Officer Ferro benefits in its back pay decision, it never addressed whether his failure to mitigate limited or affected his entitlement to those benefits, and if so, any amount he should receive.

The record before us is insufficient to permit an exercise of our original jurisdiction to determine the issue. For example, nothing in the record explains how and when Officer Ferro's vacation and sick leave would have accrued, at

what rate he would have been paid for that leave, or any details about the health insurance premiums for which he seeks reimbursement. Because our original jurisdiction under Rule 2:10-5 should be exercised "sparingly and only in clear cases that are free of doubt," Henebema v. Raddi, 452 N.J. Super. 438, 452 (App. Div. 2017), we remand to the Commission to determine Officer Ferro's entitlement to benefits in the first instance.

Affirmed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION